492 F.2d 324
 13 UCC Rep.Serv. 161, 14 UCC Rep.Serv. 289
 George T. ADAMS, Plaintiff-Appellee,
v.
SOUTHERN CALIFORNIA FIRST NATIONAL BANK, Defendant-Appellant.
Willie O. HAMPTON and Mattie Hampton, Individually and on
behalf of all otherssimilarly situated,
Plaintiffs-Appellants,
v.
The BANK OF CALIFORNIA, NATIONAL ASSOCIATION, a California
bankingcorporation, Defendant-Appellee.
 Nos. 72-1484, 72-1888.
 United States Court of Appeals, Ninth Circuit.
 Oct. 4, 1973, As Modified on Denial of Rehearing March 12, 1974.
 
 Jeffrey Isaacs (argued), Richard B. Munks, Procopio, Cory, Hargreaves & Savitch, San Diego, Cal., for defendant-appellant (Southern California First Nat. Bank).
 Michael B. Weisz, Legal Aid Society of San Diego, San Diego, Cal., (argued), Richard A. Weisz, Legal Aid Foundation of Long Beach, Long Beach, Cal., (argued), for plaintiff-appellee (Adams).
 William M. Burke (argued), Sheppard, Mullin, Richter & Hampton, Los Angeles, Cal., Robert Ames, Sterling Hutcheson, Gray, Cary, Ames & Frye, San Diego, Cal., Gendel, Roskoff, Shapiro & Quittner, Los Angeles, Cal., Styskal, Wiese & Melchione, N. Hollywood, Cal., Morrison, Foerster, Holloway, Clinton & Clark, San Francisco, Cal., Pizer & Michaelson, Santa Ana, Cal., Walter Malcolm, Bingham, Dana & Gould, Boston, Mass., Soia Mentschikoff, Chicago, Iii., for amici curiae.
 Mark E. Budnitz, National Consumer Law Center, Boston, Mass., as amicus curiae in support of plaintiff-appellee (Adams).
 Henry S. Hewitt (argued), Legal Aid Society of Alameda County, Oakland, Cal., Stefan M. Rosenzweig, Legal Aid Society of Alameda County, Model Cities Unit, Oakland, Cal., for plaintiff-appellant (Hampton).
 Noble K. Gregory (argued), John A. Sutro, Jr., Bernard Zimmerman, Pillsbury, Madison & Sutro, San Francisco, Cal., for defendant-appellee (Bank of California).
 Before: CHAMBERS and TRASK, Circuit Judges, and BYRNE,* District judge.
 TRASK, Circuit Judge:
 
 
 1
 These two cases present appeals from contrary results reached by two district courts on the question of the constitutional due process rights of debtors whose property is repossessed by self-help, without formal legal proceedings.
 
 
 2
 The Adams case is before this court on an interlocutory appeal by the Southern California First National Bank (S. Cal. Bank) from an order of the District Court of the Southern District of California granting Adams' motion for partial summary judgment.[1]
 
 
 3
 The trial court concluded first that the enactment of sections 9503 and 9504[2] of the California Commercial Code set forth a state policy constituting sufficient state action 'to raise a federal question' under the provisions of the Civil Rights Act, 42 U.S.C. 1983, and its jurisdictional counterpart, 28 U.S.C. 1343(3). From that position it concluded that the repossessions denied the plaintiffs their constitutional rights and that sections 9503 and 9504 'which provide for such takings' are constitutionally invalid.[3] This court has jurisdiction under 28 U.S.C. 1292(b), the trial judge having certified that his order involves a controlling question of law, and a panel of this court having granted leave to appeal.
 
 
 4
 The controlling questions of law are whether the repossession of motor vehicles by self-help on default of a payment contract which provides for such repossession, is an act under color of state law, and thus gives rise to a claim under 42 U.S.C. 1983, in view of the provisions of sections 9503 and 9504 of the California Commercial Code and is thus state action within the meaning of the Fourteenth Amendment; and whether such sections are unconstitutional as state action which authorizes summary repossession without affording due process.
 
 
 5
 The Hampton case involves an appeal from an order of the District Court for the Northern District of California dismissing appellant's complaint challenging the prejudgment summary repossession procedure for lack of jurisdiction over the subject matter. The appeal from the decision in the consolidated cases from the Southern District was joined with the appeal from the decision of the Northern District in this court.
 
 
 6
 Plaintiff-appellee Adams had been a continuous resident of California for nearly 48 years, and of San Diego for nearly eight years prior to the initiation of this action. While residing in San Diego, Adams had maintained a good credit record. In need of money for medical bills, on June 17, 1968, Adams borrowed $1,000 from the Bank of La Jolla (predecessor in interest to the S. Cal. Bank). In return for the loan, Adams executed a promissory note to repay $48.44 per month, for a total of $1,160.16, and a security agreement giving the bank a security interest in three vehicles-- a 1961 VW sedan, a 1960 VW sedan, and a 1959 VW van. The security agreement contained the following language:
 
 
 7
 'Should Debtor fail to make payment of any part of the principal or interest, as provided in said promissory note . . . the whole principal sum unpaid upon said promissory note with interest accrued thereon, . . . shall immediately become due and payable at the option of the Secured Party. Upon the occurrence of any such event of default Secured Party shall also have all of the rights and remedies of a Secured Party under the California Uniform Commercial Code, or any other applicable law, and all rithts and remedies shall, to the extent permitted by law, be cumulative. Without limiting the generality of the foregoing, upon the occurrence of any such event of default the Secured Party is entitled to take possession of the vehicle and to take such other measures as Secured Party may deem necessary for the protection of the vehicles . . ..'
 
 
 8
 Between July, 1968 and October, 1970, Adams experienced three job changes and intermittent unemployment. By January 22, 1970, Adams had repayed nearly $900 of the loan. On this date he became unemployed, and a further payment was not made on his loan until July 7. Between July 25 and August 17, 1970, Adams and representatives of the S.Cal. Bank discussed the status of his loan, which at that point in time had an outstanding balance of $217.45.
 
 
 9
 On August 17, 1970, the decision was made by the S.Cal Bank to take possession of the vehicles covered by the security agreement, and at some time between 5:00 p.m. on August 19 and 7:00 a.m. on August 20, Richard Egley, a repossessor licensed by the State of California, took the 1959 van and the 1960 sedan from Adams' possession.[4]
 
 
 10
 After deducting costs of repossession and storage of the vehicles from the proceeds of a private sale, the net recovery amounted to $219.15. This amount when applied against the balance due resulted in a deficiency of less than $1.00 which was cancelled.
 
 
 11
 On October 23, 1970, Adams filed suit in district court against the S.Cal. Bank and Richard Egley for damages and declaratory relief. The case was delayed pending decision by the Supreme Court of Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). After that decision and following oral argument, Adams' motion for partial summary judgment for the declaratory relief sought was granted.
 
 
 12
 Plaintiff-appellant Hampton purchased a 1967 Buick on September 3, 1969. The purchase was financed by means of a contract of sale which was assigned to The Bank of California (Bank), and which called for 30 monthly payments of $118.30, or a total of $3,549. After nearly two years of making payments, Hampton was allegedly late in making his August, 1971 payment. Hampton claims that the Bank agreed that he could make up the missed payment at a later date, so long as he kept current on the rest of his payments, and in accordance with this agreement, Hampton tendered the next month's payment. This payment was returned to him, and sometime during the night of October 14, 1971, the Bank repossessed the car. In a letter dated October 4, the Bank noticed their intent to sell the vehicle unless Hampton paid the contract balance plus collection charges, a total of $946.89.
 
 
 13
 Hampton then commenced this lawsuit as a class action, challenging the constitutionality of summary pre-judgment repossession without due process requirements of notice and opportunity for a hearing. The district judge enjoined the private sale pending a hearing on an order to show cause. Following settlement of the dispute between the Bank and Hampton, the trial judge for the Northern District of California on his own motion dismissed the case for lack of subject matter jurisdiction, finding that the state action required for jurisdiction in the federal courts under 28 U.S.C. 1343(3) was lacking. An appeal was taken which has been consolidated with the appeal in the Adams case.
 
 
 14
 The issue on these appeals is whether prejudgment self-help repossession of secured property, as provided for in the security agreements between the creditors and the debtors and as authorized under sections 9503 and 9504 of the California Commercial Code involves sufficient state action to establish a federal cause of action.[5] Adams and Hampton invoke the jurisdiction of the federal courts pursuant to 42 U.S.C. 1983 and 28 U.S.C. 1343(3),[6] claiming that the summary repossession procedures constitute action taken 'under color of state law' within the meaning of the Fourteenth Amendment.[7] If the repossession was not state action but only an individual invasion of individual rights, then the remedy is not the subject of the Fourteenth Amendment. Civil Rights Cases, 109 U.S. 3, 11, 3 S.Ct. 18, 27 L.Ed. 835 (1883). Adams also asserts federal question jurisdiction under 28 U.S.C. 1331.
 
 
 15
 Both Adams and Hampton allege that California authorizes, regulates and participates in self-help repossessions by means of a pervasive statutory scheme which sets forth, inter alia, the basic right to repossess summarily; several terms which must appear in retail installment contracts; the procedures to be followed during and after repossessions; licensing requirements for a person in the business of repossessing; and provisions that clear title to the repossessed vehicle and permit the creditor to obtain a deficiency judgment.[8] Both allege that the Code provisions embrace a state policy encouraging self-help repossession, and conclude that by sanctioning self-help repossession in statutory form, California has 'significantly' involved itself in the repossession process. Additionally, both debtors contend that Code 9503 vests in the secured party a function normally performed by the State, and that 9504 and California Civil Code 2983.2, permitting the creditor to sue for a deficiency judgment, amount to judicial enforcement of procedures by which due process right have been denied.
 
 
 16
 In addition to these arguments, appellee Adams submits that the express assertion by the S.Cal. Bank in the security agreement of its reliance on the remedies provided in the California Commercial Code clothe the creditor with the authority of state law. Adams also argues that the ultimate source of the right to repossess and resell collateral is the Code and not the security agreement.
 
 
 17
 We find that the State of California is not so significantly involved in the self-help repossesstion procedures undertaken by the creditors in these cases to permit this court to find the state action or conduct taken under color of state law required to establish a federal cause of action.
 
 
 18
 The under color of law requirement of 1983 has been treated as the equivalent of the state action requirement of the Fourteenth Amendment. United States v. Price, 383 U.S. 787, 794-795 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); Green v. Dumke, 480 F.2d 624, 628 (9th Cir. 1973); but cf. Adickes v. S.H. Kress & Co., 398 U.S. 144, 188, 90 S.Ct. 1598, 26 L.Ed.2d 142 passim (1970) (Brennan, J., concurring and dissenting). Under these concepts, the Supreme Court has frequently held that action taken by what would otherwise be considered to be private individuals or organizations is within the state action definition.[9] In the present cases we have action in the nature of summary seizure of personal property, taken by private creditors or their representatives, without having requested state help and without any direct action or review by state officials.[10] The Supreme Court has stated recently that:
 
 
 19
 'Our holdings indicate that where the impetus for the discrimination is private, the State must have 'significantly involved itself . . .' to fall within the ambit of the constitutional prohibition.' Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 173, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972).
 
 
 20
 Although it is not perfectly clear that the same state action test used by the Court in equal protection cases applies to due process cases, we must consider California's involvement in self-help repossessions undertaken by creditors located in California with the 'significantly involved' concept in Mind.
 
 
 21
 We begin our consideration of California's involvement in self-help repossession by referring to the admonition of the Supreme Court that:
 
 
 22
 'to fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an 'impossible task' which '(the Supreme Court) has never attempted.' . . . Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.' Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).
 
 
 23
 One essential element for taking action under color of law is that the person act 'with the knowledge of and pursuant to' a State law, statute, etc. Adickes v. S. H. Kress & Co., 398 U.S. 144, 162 n. 23, 90 S.Ct. 1598, 1611, 26 L.Ed.2d 142 (1970). The debtors point to the security agreement, the terms of which conform with Code 9503 and 9504, and which refers to and incorporates the rights and remedies of a secured party under the Code, as evidence that the creditors acted with knowledge of and pursuant to a state statute. The debtors also note the reference in the security agreement to 'any other applicable law,' and the reliance by the creditors on their legal right to repossess as action taken with knowledge of and pursuant to state law. Finally, they contend that California, by the several statutory sections cited earlier, has legislated binding contract terms and conditions, and that the Commercial Code sections in particular have replaced the common law or contractual basis for these remedies. On the other hand, the creditors claim that it was the contract provision upon which the creditors relied for their authority to repossess.
 
 
 24
 Prior to the enactment of the California Commercial Code section in issue, parties to a secured transaction could provide by contract for the remedy of self-help repossession;[11] indeed, this remedy has been recognized and permitted as a part of the common law.[12] However, we do not consider it conclusive that section 9503 of the California Commercial Code confirmed what the law of California had theretofore been, i.e., that a secured party upon default had a right to take possession of the collateral. This is not the final answer to the touchstone of state action. Were such a test the only one, the California statutes adopting the common law of England[13] would cast the shadow of state action over all activity and pose an argument that could blanket all individual wrongs under section 1983. Moreover, the very fact that section 9503 gives the alternative of private repossession would appear to contradict the argument that all action under the statute must necessarily be 'state' action.
 
 
 25
 The objective finding that the creditors in part acted with Knowledge of and pursuant to state law is but one element of the action taken under color of state law requirement; alone it is not sufficient. The test is not state involvement, but rather is significant state involvement.[14] Statutes and laws regulate many forms of purely private activity, such as contractual relations and gifts, and subjecting all behavior that conforms to state law to the Fourteenth Amendment would emasculate the state action concept.[15] Further inquiry needs to be made into the relationship between creditors and the State to see whether the State is significantly involved or entangled in the challenged repossessions, or whether mutual benefits are conferred which would lead to a finding of a 'symbiotic relationship' between creditors and the State that was present in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), but was absent in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972).[16]
 
 
 26
 The legal framework for self-help repossession is found in part 5 of article 9 of the Code. Generally, 9503 provides that the secured party's right to possession of the collateral accrues on default, unless otherwise agreed, and it allows the secured party to take possession with or without the issuance of judicial process. The Code itself does not require any notice to the debtor prior to the taking of possession.[17] Section 9504 sets forth the right of the secured party to dispose of the collateral at a commercially reasonable public or private sale, and if the secured party fails to comply with statutory rules the debtor is authorized to pursue various remedies. In addition, provision is made for the debtor's right to surplus and liability for deficiency.
 
 
 27
 The debtors contend that the involvement of the state is reflected by teh enactment of 9503 and 9504 of the Commercial Cide, which put into statutory form the ritht of creditors to repossess without judicial process, restrict the procedures to be used on default, and authorize a deficiency judgment.[18] They also state that the Rees-Levering Act[19] regulates all aspects of motor vehicles sales pursuant to retail installment contracts,[20] that repossessors are required to be licensed,[21] and that California clears the title to repossessed vehicles for the creditors. These state laws, they continue, set out a clear policy, authorizing and encouraging the use of self-help remedies which significantly involves California in the challenged activity.
 
 
 28
 The principal case upon which the debtors rely for legal support is Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). The California legislature had, during the period 1959-- 1963, enacted several statutes regulating racial discrimination in housing. In 1964, pursuant to an initiative and referendum, art. I, 26 (Proposition 14) was added to the state constitution to provide that the State could not place any limitation on the right of a person to deal with his own real property. The historical basis of the challenged constitutional provision led the California Supreme Court to hold that the intent of art. I, 26 was to authorize private racial discrimination in the housing market, to repeal the Unruh and Rumford Acts (which regulated racial discrimination in housing), and to create a constitutional right to discriminate on racial grounds in the sale and leasing of real property. The Supreme Court agreed that art. I, 26 significantly encouraged and involved the State in private discrimination. It held the California constitutional amendment to be violative of the United States Constitution. Reitman, supra, 387 U.S. at 381, 87 S.Ct. 1627.
 
 
 29
 The present cases present at least two distinguishing features. First, the State in Reitman was involved to a far greater degree in the challenged conduct, because the proposition approved there had been initiated for the purpose of authorizing what had before been expressly prohibited, and if enacted would raise a barrier to the realization of a constitutional goal. This finding was made by the California Supreme Court, and on appeal the Supreme Court found no persuasive considerations upon which to overturn the judgment of the California court. In these self-help cases, the enactment of the provisions of the Uniform Commercial Code did not reverse the law as it had been prior to the enactment of the Code, but merely codified existing law for the most party. This is particularly true for the creditor's remedy of self-help repossession.
 
 
 30
 Second, and consistent with the reasoning of several other courts,[22] we are not convinced that the resolution of the state action question involving prejudgment self-help repossession of secured property is controlled by a case involving racial discrimination.[23] Unlike Reitman, there has been no finding that it was the intent of the State in passing 9503 to authorize any conduct that would violate the Fourteenth Amendment. And unlike racial discrimination cases in general, which have evidenced a pattern of intentional indirect circumvention of constitutional rights,[24] these creditor remedies were based on economically reasoned grounds of very long standing, which appear to have been the topic of extensive research and legislative investigation.[25]
 
 
 31
 We consider Reitman quite relevant for what the Supreme Court stated that case did not hold:
 
 
 32
 '(the California court) did not read either out cases or the Fourteenth Amendment as establishing an automatic constitutional barrier to the repeal of an existing law prohibiting racial discriminations in housing; nor did the court rule that a State may never put in statutory form an existing policy of neutrality wiht respect to private discriminations.' 387 U.S. at 376, 87 S.Ct. at 1631.
 
 
 33
 In addition to the practical consideration that a great deal of human behavior conforms to state law, we find the last portion of the quoted language nearly controlling as authority on which to reject the debtors' allegations that by merely putting into statutory form existing private remedies, the State conclusively and significantly involves itself in the private conduct.
 
 
 34
 Nor do we find anything approaching the symbiotic relationship between the lessor and lessee that was present in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Cf. Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 174-175, 92 S.Ct. 1965, 32 L.Ed.2d 627. The creditors in these cases were not located on land owned by any public authority, and were not part of a large, continuing public enterprise.[26] It has not been shown how the State or any of its agencies has been benefitted as was the parking authority in Burton, nor has it been shown how any significant benefit has been conferred on the creditors by the enactment of 9503.[27] It is arguable that the State has made it more difficult for a debtor to opt out of the self-help remedy now that it has been put in statutory form,[28] but the creditors had the remedy prior to the legislation, and repeal of 9503 would still leave the parties free to provide in the security agreement for the self-help remedy. The State cannot be held resposible for creating the conditions that result in standardized contracts in the credit industry which typically provide for self-help repossession without notice or an opportunity for a hearing prior to the seizure of property.[29]
 
 
 35
 Another basis upon which the debtors urge that state action may be found is the extensive system of state regulation. In Robinson v. Florida, 378 U.S. 153, 84 S.Ct. 1693, 12 L.Ed.2d 771 (1964), state health regulations required separate toilet facilities for whites and blacks. There was nothing that directly forbade restaurants from serving both races. The Supreme Court found that the regulations placed burdens upon restaurants serving both races and concluded:
 
 
 36
 'that the State through its regulations has become involved to such a significant extent in bringing about restaurant segregation that appellants' trespass convictions must be held to reflect that state policy and therefore to violate the Fourteenth Amendment.' 378 U.S. at 156-157, 84 S.Ct. at 1695.
 
 
 37
 In Moose Lodge, supra, the trial court directed attention to the many ways in which the Pennsylvania Liquor Control Board exerted its regulatory will over private clubs as proof of the pervasive nature of state action there. 407 U.S. at 176-177, 92 S.Ct. 1965. But the Court pointed out that none of the regulations had significance on the issue for decision, that is, the establishing or enforcing of discriminatory guest policies. Here, appellees point to a comprehensive system for sale of collateral, notice of sale, and application of payments. None of these requirements addresses itself to the issue of when and whether private repossession will be used or whether formal court action will be preferred. There is no 'pervasive' state action directed to self-help repossession to require its use. It is simply named as one of two already existing alternatives.
 
 
 38
 A similar issue has been involved in non-racial cases involving utility service termination procedures of privately owned utility companies. Palmer v. Columbia Gas, Inc., 479 F.2d 153 (6th Cir. 1873); Ihrke v. Northern States Power Co., 459 F.2d 566 (8th Cir.), vacated as moot, 409 U.S. 815, 93 S.Ct. 66, 34 L.ed.2d 72 (1972); Bronson v. Consolidated Edison, 350 F.Supp. 443 (S.D.N.Y. 1972); Hattel v. Public Service Co., 350 F.Supp. 240 (D.Colo.1972); Stanford v. Gas Service Co., 346 F.Supp. 717 (D.Kan. 1972). Contra, Lucas v. Wisconsin Electric Power Co., 466 F.2d 638 (7th Cir. 1972); Jackson v. Metropolitan Edison Co., 348 F.Supp. 954 (M.D.Pa.1972). In Palmer, an Ohio statute authorized the utility to enter the premises of a customer who allegedly had not paid his bill, to disconnect service and remove equipment. Stressing the monopolistic character of the company, and the necessity of the service it provided, the Sixth Circuit found state action because virtually every aspect of the company's operations were subject to regulation by the state or city, because the state had granted to utilities powers not usually possessed by private corporations (authorized entry to private property; eminent domain), and because the company was undertaking a legitimate public function by providing gas service.
 
 
 39
 The Lucas case involved a similar fact situation, but there the Seventh Circuit found that the authority given to the utility by the State to enter private property had not been invoked by the defendants. The activity challenged by the plaintiffs in Lucas was termination of service, and the utility could accomplish this by simply throwing the proper switch, or disconnecting wires; thus, the Court found no action taken under color of state law by the utility.
 
 
 40
 For our cases, the utility termination cases are relevant because they deal with state action in a non-racial area. We agree with the standard that the support by the State of private conduct must be significant to come within 1983, and that, as stated by the Seventh Circuit:
 
 
 41
 'affirmative support must be significant, measured by its contribution to the effectiveness of defendant's conduct, or perhaps by its defiance of conflicting national policy . . ..' Lucas, supra, 466 F.2d at 656.
 
 
 42
 And, we can distinguish the creditor's actions in our cases from the utility in Palmer on the basis of the greater extent to which the State has reserved power to control and regulate the operations of a public utility, and the greater amount of power given to the utility which is usually reserved to the State. See Palmer, supra, 479 F.2d at 164.[30]
 
 
 43
 The debtors contend that, although private in form, the substance of the action of the creditors was to perform a function or service that would otherwise in all likelihood be performed by the State, and thus is distinguishable from the facts in Moose Lodge. The debtors rely on the 'public function' cases decided by the Supreme Court,[31] and particularly on the approach taken by the Fifth Circuit in Hall v. Garson, 430 F.2d 430 (5th Cir. 1970).[32] There, the Fifth Circuit discussed state action in the context of whether appellant, a tenant who had her television set seized by a landlord under the authority of a Texas statute (which gave the landlord a lien on personal goods of the tenant, and authority to enforce that lien by peremptory seizure of the property), had stated a claim for which relief could be granted under 42 U.S.C. 1983. That circuit held:
 
 
 44
 'In this case the alleged wrongful conduct was admittedly perpetrated by a person who was not an officer of the state or an official of any state agency. But the action taken, the entry into another's home and the seizure of another's property, was an act that possesses many, if not all, of the characteristics of an act of the State.' 430 F.2d at 439.
 
 
 45
 Hall is distinguishable because the state of Texas was significantly involved in the private landlord's conduct. The property seized in that case belonged to the tenant, and the action of the landlord was taken pursuant to a Texas statute which vested authority in the landlord that was normally exercised by the State and had historically been a function of the State of Texas. The landlord clearly had invoked state procedures in order to seized the tenant's property. Cf. Joy v. Daniels, 479 F.2d 1236 (4th Cir. 1973). In Hampton, the creditor was seizing property that had been entirely his and that, practically and according to the terms of the contract, the debtor had not yet paid for.[33] Further, a strong case can be made that it is a tradition that repossession is not a state function, and that the creditor was invoking a private remedy rather than a state power which had been delegated to him.
 
 
 46
 Legal researchers point out that English law in the thirteenth century rigorously prohibited self-help, that it 'at a fairly early stage . . . begins to prohibit in uncompromising terms any and every attempt to substitute force for judgment.'[34] Historians appear to differ over just when the law began to ease with respect to allowing self-help.[35] Based on this history, it does not appear likely that the Fourteenth Amendment, when written, was intended to eliminate summary self-help in light of the prevailing use of peaceful repossession.[36]
 
 
 47
 The debtors attack 9504 on the grounds that the procedures set forth in that section supplement the self-help right and so should be considered as part of the challenged conduct, and that the deficiency judgment action authorized by 9504 represents a statutorily created right not allowed creditors at common law, and results in judicial enforcement of procedures whereby due process has been denied, thus coming under Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) and Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).
 
 
 48
 The creditors respond that 9504 was not held unconstitutional by the district court's opinion, and therefore is not in issue on this appeal. Although the opinion of the lower court does explicitly state that 9504 procedures are unconstitutional, the creditors contend that the opinion specifically limited the issue there to repossession procedure, and did not discuss any constitutional defect of the Code provision for permitting a deficiency judgment action to secured parties.
 
 
 49
 One major difference between enforcement of a deficiency claim and enforcement of racially restrictive covenants is that the deficiency claim is based on the underlying debt, and thus arguably not related to the alleged unconstitutional seizure. Another is that the restrictive covenant cases may be and apparently have been limited to situations where the judicial enforcement had the effect of forcing an unwilling party to discriminate. Furthermore, Shelley involved what would effectively amount to a zoning practice, traditionally a state activity.
 
 
 50
 Finally, we note cases which have held that state enforcement procedures, applied neutrally, will not alone rise to the level of state action absent a showing that a state in applying its law is privy to a private party's discriminatory purpose, see Griffin v. Maryland, 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964) (state arrest and prosecution of blacks for using a privately owned amusement park open to the public); Weigand v. Afton View Apartments, 473 F.2d 545, 548 (8th Cir. 1973); Lavoie v. Bigwood, 457 F.2d 7, 11 (1st Cir. 1972), or that some significant state power has been delegated to the private organization or individual. Joy v. Daniels, 479 F.2d 1236 (4th Cir. 1973) (mortgage benefits and rent supplements received from FHA, authorization from the County Council, and state approval of federal participation when combined with use of state eviction procedures led to a finding of state action); Lavoie v. Bigwood, supra (confluence of court-ordered eviction and monopoly power created by zoning led to finding state action in eviction of mobile home park tenant).
 
 
 51
 Adams contends that the Code provisions clothe secured parties with the authority of state law, relying on United States v. Price, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); and Williams v. United States, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951). The first two cases involve action taken directly and clearly in concert with state officials in an indirect attempt to avoid discrimination prohibitions. The Williams case was concerned with a private detective who held a special police officer's card issued by the city of Miami, Florida, had taken an oath and qualified as a special police officer, and was employed by a business corporation to uncover the identities of thieves who had been stealing their property. Using brutal methods, the detective, often accompanied by a police officer and flashing a badge, obtained confessions from several suspects. That fact situation amply describes what is meant by being clothed with the authority of state law. The creditors in the present cases have not been endowed with anything comparable to the authority given the detective in Williams, nor were they working in active concert with state officials as were the defendants in Price and in Guest.
 
 
 52
 A final word about Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), which seems to constitute both warp and woof of appellee's contentions. On the face of it the Court was there dealing with a state statute under which an action had been filed in court, a writ formally issued, and service of the writ by a state agent. No question about state action. We do not read Fuentes so broadly that it encompasses all private actions between individuals pursuant to their consensual undertakings. The plurality, speaking for the Court, recognize that at common law in addition to formal state action, a creditor could proceed by self-help. 407 U.S. 67, 79 n. 12, 92 S.Ct. 1983. The minority appears to read the Court's opinion as one clearly distinguishing between the state action rule of Fuentes and private repossession.
 
 
 53
 'It would appear that creditors could withstand attack under today's opinion simply by making clear in the controlling credit instruments that they may retake possession without a hearing, or, for that matter, without resort to judicial process at all.' 407 U.S. at 102, 92 S.Ct. at 2005.
 
 
 54
 We reverse in Adams and affirm in Hampton, noting that the proper ground for dismissing, noting that the proper ground for dismissing in Hampton was failure to state a federal cause of action, rather than that the federal court lacked subject-matter jurisdiction. Bell v. Hood, 327 U.S. 678, 681-683, 66 S.Ct. 773, 90 S.Ct. 939 (1946).
 
 
 55
 BYRNE, District Judge (dissenting).
 
 
 56
 Both Adams and Hampton sought relief under 42 U.S.C. 1983 on the grounds that the creditor banks acted 'under color of law' and deprived them of 'due process of law' by repossessing their automobiles pursuant to Cal.Comm.C. 9503 and selling those vehicles pursuant to Cal.Comm.C. 9504. The majority opinion holds in favor of the creditor banks on the 'under color of law' issue and apparently considered it unnecessary to discuss the 'due process of law' issue. It is my view that the debtors should prevail on both issues.
 
 
 57
 Regardings the 'due process of law' issue, even the creditors appear to concede that, if they did act 'under color of law,' the debtors were deprived of due process of law because no judicial hearing was conducted prior to the summary self-help procedures utilized.
 
 
 58
 Undoubtedly, the creditors' apparent concession on the 'due process of law' issue is compelled by the recent case of Fuentes v. Shevin, 407 U.S. 67, 86-87, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) where the Supreme Court stated:
 
 
 59
 'The appellants who signed conditional sales contracts lacked full legal title to the replevied goods. The Fourteenth Amendment's protection of 'property,' however, has never been interpreted to safeguard only the rights of undisputed ownership. Rather, it has been read broadly to extend protection to 'any significant property interest,' Boddie v. Connecticut, 401 U.S. 371, at 379 (91 S.Ct. 780, 28 L.Ed.2d 113), including statutory entitlements. See Bell v. Burson 402 U.S. 535, at 539, 91 S.Ct. 1586, 29 L.Ed.2d 90; Goldberg v. Kelly, 397 U.S. (254) at 262 (90 S.Ct. 1011, 25 L.Ed.2d 287).
 
 
 60
 'The appellants were deprived of such an interest in the replevied goods-- the interest in continued possession and use of the goods. See Sniadach v. Family Finance Corp., 395 U.S. (337) at 342 (89 S.Ct. 1820, 23 L.Ed.2d 349) (Harlan, J., concurring). They had acquired this interest under the conditional sales contracts that entitled them to possession and use of the chattels before transfer of title. In exchange for immediate possession, the appellants had agreed to pay a major financing charge beyond the basic price of the merchandise. Moreover, by the time the goods were summarily repossessed, they had made substantial installment payments. Clearly, their possessory interest in the goods, dearly bought and protected by contract, was sufficient to invoke the protection of the Due Process Clause.
 
 
 61
 'Their ultimate right to continued possession was, of course, in dispute. If it were shown at a hearing that the appellants had defaulted on their contractual obligations, it might well be that the sellers of the goods would be entitled to repossession. But even assuming that the appellants had fallen behind in their installment payments, and that they had no other valid defenses, that is immaterial here. The right to be heard does not depend upon an advance showing that one will surely prevail at the hearing. 'To one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense upon the merits.' Coe v. Armour Fertilizer Works, 237 U.S. 413, 424 (35 S.Ct. 625, 59 L.Ed. 1027). It is enough to invoke the procedural safeguards of the Fourteenth Amendment that a significant property interest is at stake, whatever the ultimate outcome of a hearing on the contractual right to continued possession and use of the goods.'
 
 
 62
 By its nature, the 'under color of law' issue is very conceptual and readily susceptible to purposeful interpretation by both the creditors and the debtors. Admittedly, Judge Trask, writing for the majority, supports his holding on this issue with adequate logic and case authority. He mentions each of the debtors' five arguments in opposition to his holding and he distinguishes the case authority which they offer in support of those arguments. However, in doing so, he seems to purposefully characterize 9503 and 9504 as being mere codifications of previously-existing commercial law. Indeed, such a purposeful reasoning process could likewise justify a contrary holding and thereby protect debtors such as Adams and Hampton from the well-known creditor abuses which often occur when those summary self-help provisions are utilized.
 
 
 63
 Such a contrary holding can be justified by the debtors' 'state encouragement argument' and supported by Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). Both that argument and that case are discussed in the majority opinion. The majority claims that Reitman is distinguishable from the instant two cases for the following two reasons: (1) In Reitman, the State of California was involved to 'a far greater degree' because it approved Proposition 14 and thereby reversed previously-existing law. In the instant two cases, the legislature enacted 9503 and 9504 in order to codify previously-existing law rather than to reverse it; and (2) In Reitman, California's 'subjective intent' in approving Proposition 14 was to indirectly circumvent individual constitutional rights and to encourage racial discrimination in housing. In the instant two cases, the debtors have failed to show that the State harbored such an insidious 'subjective intent.'The majority's asserted distinctions do not render Reitman inapplicable to the instant two cases. The first alleged distinction is merely a bare conclusion, i.e., that the State was involved to 'a far greater degree' in Reitman, is justified by an insignificant factual difference, i.e., 9503 and 9504 merely codified previously-existing law rather than reversing it. The second asserted distinction seems to suggest that the debtors must prove an unprovable fact, i.e., that California's subjective intent in enacting 9503 and 9504 was to deprive debtors such as Adams and Hampton of due process of law. Such an argument tends to obscure the more important fact that the creditor banks relied on those statutory provisions in order to deprive the debtors of their proprietary interests in the automobiles without due process of law.
 
 
 64
 The State of California deliberately chose to follow a State policy of encouraging the repossession and sale of collateral without a prior judicial hearing. It embodied such a policy in 9503 and 9504. The creditors admit that they acted pursuant to those sections when they repossessed and sold the collateral. The State meaningfully encouraged the repossessions and sales and thus became significantly involved within the meaning of Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).
 
 
 65
 It is clear that the creditors acted under color of State law and it follows that they deprived the debtors of 'due process of law' by repossessing their automobiles pursuant to that law.
 
 
 66
 I would affirm in Adams and reverse in Hampton.
 
 
 67
 HUFSTEDLER, Circuit Judge (dissenting from denial of hearing en banc):
 
 
 68
 I cannot agree that California's self-help repossession scheme does not so significantly involve the state as to constitute state action for the purpose of invoking the Fourteenth Amendment. Although each aspect of California's participation, considered alone, might be inadequate to compel a state action conclusion, the combination of its activities draws the state well within the state action ambit. As Public Utilities Commission v. Pollak (1952), 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 teaches, ostensibly private action is state action if the state both heavily regulates the private activity and specifically approves the very practice challenged under the Fourteenth Amendment.[1] Underlying the principle in Pollak is a recognition that enterprises operating within heavily regulated areas of activity are performing functions substantially affecting the public weal. The more pervasive is the regulation, the more likely is the regulated enterprise performing a function of the state.[2] Demonstration of governmental interest, rather than the particular nature[3] or history[4] of the specific activity, is the public function indicium. When the activity not only falls within a regulated area, but also is the subject of a statute or administrative rule that expressly authorizes or mandates that activity by a regulated enterprise, private conduct pursuant to the statute or rule is deemed to be state action, as Moose Lodge No. 107 v. Irvis (1972), 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 implicitly acknowledges. There, the state heavily regulated some aspects of the lodge's activity, but it exercised no regulatory jurisdiction over the lodge's discriminatory membership and guest policies.[5] The Court distinguished Moose Lodge from Pollak solely on the ground that 'unlike the situation in Public Utilities Comm'n v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952), where the regulatory agency had affirmatively approved the practice of the regulated entity after full investigation, the Pennsylvania Liquor Control Board has neither approved nor endorsed the racially discriminatory practices of Moose Lodge.' (Moose Lodge No. 107 v. Irvis, supra, 407 U.S. at 175-176 n. 3, 92 S.Ct. at 1973.) If the Pennsylvania regulatory agency had authorized the discriminatory policies of the lodge, the state would thereby have assumed regulatory jurisdiction. Having assumed regulatory jurisdiction of such behavior, any acts of the lodge authorized by statute or regulation would have been state action.
 
 
 69
 When the principles of Pollak and Moose Lodge are applied to the California self-help repossession scheme, the conclusion of state action is compelled. The automobile-secured credit industry is heavily regulated by the state. (See, e.g., Cal.Civil Code 2981-2984.4; Cal.Comm.Code 9101-9507.) Self-help repossession, an ingredient of the industry, is the subject of elaborate state regulations. California authorizes self-help repossession (Cal.Comm.Code 9503), and authorizes the creditor to obtain a deficiency judgment after sale of the repossessed automobile (id. 9504). It requires that the police be notified of self-help repossessions (Cal.Veh.Code 28) and facilitates the transfer of title to repossessed automobiles (id. 5601, 9561). The Private Investigators and Adjusters Act (Cal.Bus. & Prof.Code 7500-7590) licenses repossessors and regulates their activities. A state agency conducts examinations, collects fees, disciplines licensees, and otherwise administers the regulations. (Id. 7510-7514; see 16 Cal.Admin.Code 651-690.) The final weld of 'private' action to state action is made by the statutes authorizing state licensed and regulated repossessors to carry out self-help repossession (Cal.Bus. & Prof.Code 7500-7590) on behalf of creditors who are given the right to use self-help unless the contract between the creditor and the debtor expressly denies them the remedy. (Cal.Comm.Code 9503.)
 
 
 70
 California is not a neutral bystander in a contest between these private debtors and creditors. The economy of the state has become heavily dependent on the automobile industry in all its parts, an essential feature of which is consumer credit secured by interests in automobiles. California's statutory authorization to creditors to seize automobiles without prior notice or hearing reduces the creditors' costs of repossession, for the evident purpose of stimulating the flow of consumer credit for the benefit of the state's economy, at the expense of those whose automobiles are summarily seized. Thus, the automobile-secured credit industry in California has become a state instrumentality through which California seeks to generate public benefits. Of greater moment in this state action context, however, is that California's regulatory scheme, by delegating to private persons power to resort to self-help, saves the state the expense that it would otherwise incur in using its own governmental personnel to seize the property and in providing notice and hearing before the state's judicial and quasi-judicial officers. The state cannot avoid the impact of the Fourteenth Amendment by thriftily abdicating these functions to private persons. It cannot do so by expressly delegating a part of them to creditors or their nominees. (See Hall v. Garson (5th Cir. 1970), 430 F.2d 430; cf. Evans v. Newton (1966), 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373; United States v. Wiseman (2d Cir. 1971), 445 F.2d 792. See also Burton v. Wilmington Parking Authority (1961), 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45; Terry v. Adams (1953), 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152; Williams v. United States (1951), 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774.)
 
 
 71
 California's involvement in self-help repossession can be put into striking perspective by comparing these cases to Moose Lodge. Moose Lodge would have been analogous to Adams and Hampton if in Moose Lodge the state had not merely generally regulated the lodge, but had also, for public purposes, specifically authorized the lodge to discriminate on the basis of race and licensed agents of the lodge to effect that discrimination. As Moose Lodge itself indicates, a scheme of that kind would have brought the state squarely within the range of Pollak. (Compare Moose Lodge No. 107 v. Irvis, supra, 407 U.S. at 178-179, 92 S.Ct. 1965, with id. at 175-176 n. 3, 92 S.Ct. 1965.)
 
 
 72
 Underlying the reluctance of this court to reach the state action destination to which the Supreme Court has directed us is fear that the same path will carry the Fourteenth Amendment into boundless territory. I do not share that fear. Very substantial limitations of the state action doctrine articulated by the Supreme Court in Public Utilities Commission v. Pollak, supra, inhere in that decision. (See Moose Lodge No. 107 v. Irvis, supra.) Even in those restricted instances in which private activity is drawn into the public orbit, few private acts are of the kind that could be found substantively violative of the Fourteenth Amendment. When the alleged violation of the Fourteenth Amendment lies in the procedural due process realm, flexible accommodations of the competing interests involved can be fashioned. (See, e.g., Fuentes v. Shevin (1972), 407 U.S. 67, 90-92, 92 S.Ct. 1983, 32 L.Ed.2d 556; cf. Lindsey v. Normet (1972), 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36; D. H. Overmyer Co. v. Frick Co. (1972) 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124.)
 
 
 73
 We cannot permit the Fourteenth Amendment to be blunted because we fear that it may sometime have too sharp a point. The judiciary has ample tools to halt excesses if they arise.
 
 
 74
 I would take the cases en banc, affirm Adams, and reverse Hampton.
 
 
 
 *
 Honorable William M. Byrne, Sr., United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 In the District Court, the Adams case was consolidated with Posadas v. Star & Crescent Federal Credit Union upon a stipulation to decide the single issue of declaratory relief. Both Adams and Posadas filed a motion for partial summary judgment which was granted by the trial court, and it is from that order that this appeal arises. The controlling question of law certified by the trial court is one affecting both cases, and although the record is unclear, this appeal would appear to affect and control the disposition of both Adams and Posadas. The trial court's opinion is reported at 338 F.Supp. 614 (S.D.Cal. 1972)
 
 
 [2]
 Section 9503 provides in pertinent part,
 'Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action. If the security agreement so provides the secured party may require the debtor to assemble the collateral and make it available to the secured party at a place to be designated by the secured party which is reasonably convenient to both parties. Without removal a secured party may render equipment unusable, and may dispose of collateral on the debtor's premises under Section 9504.'
 Section 9504 provides in pertinent part,
 '(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. . .. '(2) If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency . . ..'
 
 
 [3]
 338 F.Supp. at 618
 
 
 [4]
 At the time of the summary seizure, the two vehicles contained various items of personal property not covered by the security agreement. Adams made unsuccessful attempts to recover this property by contacting both the Southern California Bank and Egley on two different occasions. He finally regained these items some six weeks later
 
 
 [5]
 It is important to emphasize that what is challenged here is not self-help repossession as a remedy, but rather the procedure of using self-help without giving notice or providing the opportunity for a hearing prior to the seizure
 
 
 [6]
 42 U.S.C. 1983 provides:
 'Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.'
 28 U.S.C. 1343(3) provides:
 'The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: '(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;'.
 
 
 [7]
 Section 1 of the Fourteenth Amendment provides:
 '. . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.'
 
 
 [8]
 Relevant California statutory provisions are: (a) for the right to repossess, Civil Code 2983.3; (b) for provisions required in retail motor vehicle conditional sales contracts, Civil Code 2982; (c) for the right to sell the repossessed vehicle and the requirement of giving notice before resale, Civil Code 2983.2; (d) for licensing of repossessors, Business and Professions Code 7520, 7521; (e) for clearing title to the repossessed vehicle, Vehicle Code 5600, 5601, 5602, and 9561
 
 
 [9]
 See, e.g., Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Amalgamated Food Employees Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968); Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); Robinson v. Florida, 378 U.s. 153, 84 S.Ct. 1693, 12 L.Ed.2d 771 (1964); Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). But cf. Lloyd Corp. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972); Central Hardware Co. v. NLRB, 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972); Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); and Evans v. Abney, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970)
 
 
 [10]
 This factor is what distinguishes these cases from Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), because there in enforcing the creditor's writ of replevin, issued summarily by a court clerk, a state officer seized the repossessed goods. Some of the evils are still present-- no state official participates in the decision to repossess, nor does one evaluate the need for immediate seizure, nor does one review the basis for the claim to repossession-- but because control over state power has not been abdicated, the State here does not act in the dark. Cf. Fuentes, supra, 407 U.S. at 93, 92 S.Ct. 1983
 
 
 [11]
 California did not enact the Uniform Conditional Sales Act and the courts in this area were dependent upon case law and terms of the agreement. Upon the buyer's default, the seller could repossess under the terms of the contract, or if this right was not expressly given, it could have been implied. See, e.g., Johnson v. Kaeser, 196 Cal. 686, 694-695, 239 P. 324 (1925); Miller v. Steen, 34 Cal. 138, 144 (1867); Hines, Rights and Remedies Under California Conditional Sales, 23 Cal.L.Rev. 557 (1935)
 
 
 [12]
 2 Gilmore, Security Interests in Personal Property 44.1, at 1212 (1965); Uniform Conditional Sales Act 16, comment; 2 F. Pollack & F. Maitland, History of English Law, at 574-77 (2d ed. 1899)
 
 
 [13]
 'The common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of this State, is the rule of decision in all the courts of this State.' California Civil Code 22.2 (West 1954)
 
 
 [14]
 Moose Lodge v. Irvis, 407 U.S. 163, 173, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); Reitman v. Mulkey, 387 U.S. 369, 380, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)
 
 
 [15]
 This extremely broad test appears to have been rejected even in the racial area in Evans v. Abney, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970), where state law on will interpretation, although effectively excluding Negroes from what had been a public park, was found not to violate the Fourteenth Amendment. See also Colvin v. Avco Financial Services, inc., 12 U.C.C.Rptr. 25, 26-27 (D.Utah 1973); Kirksey v. Theilig, 351 F.Supp. 727, 732 (D.Colo.1972); Oller v. Bank of America, 342 F.Supp. 21 (N.D.Cal.1972). If we were to accept the debtors' broad test, it would be very difficult to draw any line between state and private action. Indeed, the creditors point out this difficulty when they argue that if any action in conformance with a state law were state action for purposes of the statute (1983) or the constitutional amendment, then the action of the debtors in withholding payments without affording the creditors due process is state action. See Code 2-717
 
 
 [16]
 Or as some courts have stated the formulation, the state must be directly or actively involved, rather than lend mere passive support. Lucas v. Wisconsin Electric Power Co., 466 F.2d 638, 654-656 (7th Cir. 1972); Greene v. First National Exchange Bank, 348 F.Supp. 672 (W.D.Va.1972)
 
 
 [17]
 Phil Phillips Ford, Inc. v. St. Paul Fire & Marine Insurance Co., 454 S.W.2d 465 (Tex.Civ.App.1970)
 
 
 [18]
 Commercial Code 9501(3) provides that certain rights and duties may not be waived or varied. In addition, the comment to 9101 states:
 'Except for procedure on default, freedom of contract prevails between the immediate parties to the secured transaction.'
 
 
 [19]
 The relevant portions of the Rees-Levering Act (California Civil Code 2982 et seq.) are:
 '2982. Formalities of conditional sales contracts. ' (a) Every conditional sale contract for the sale of a motor vehicle, with or without accessories, shall be in writing and, if printed, shall be printed in type no smaller than six point, and shall contain in a single document all of the agreements of the buyer and seller with respect to the total cost and the terms of payment for the motor vehicle, including any promissory notes or any other evidences of indebtedness. The conditional sale contract or a purchase order shall be signed by the buyer or his authorized representative and by the seller or its authorized representative, and an exact copy thereof shall be furnished the buyer by the seller at the time the buyer and the seller have signed the contract or purchase order. No motor vehicle shall be delivered under this chapter until the seller delivers to the buyer a fully executed copy of the conditional sale contract or purchase order and any vehicle purchase proposal and any credit statement which the seller has required or requested the buyer to sign and which he has signed, during the contract negotiations. The seller shall not obtain the signature of the buyer to a contract when it contains blank spaces to be filled in after it has been signed. Every conditional sale contract shall contain, although not necessarily in the sequence or order set forth below, the following separate items: '10. A notice, in at least eight-point bold type if the contract is printed, reading as follows: 'Notice to the buyer: (1) Do not sign this agreement before you read it or if it contains any blank spaces to be filled in. (2) You are entitled to a completely filled-in copy of this agreement. (3) Under the law, you have the right to pay off in advance the full amount due and under certain conditions to obtain a partial refund of the finance charge. (4) If you default in the performance of your obligations under this agreement, the vehicle may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement."
 
 
 [20]
 If the broad test for state action proposed by the debtors were accepted, it would appear that any and every sales transaction that complied with the Rees-Levering Act would be state action. Cf. Central Hardware Co. v. NLRB, 407 U.S. 539, 547, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972). It appears both illogical and strained to suppose that the framers of the Fourteenth Amendment would have included all private sales paid for in installments under the state action concept
 
 
 [21]
 The argument that the licensing of the repossessors could amount to significant state involvement in the repossession is probably foreclosed by Moose Lodge. See the dissent of Justice Douglas, 407 U.S. at 180, 92 S.Ct. 1965
 
 
 [22]
 colvin v. Avco Financial Services, Inc., 12 U.C.C.Rptr. 25 (D.Utah 1973); Kirksey v. Theilig, 351 F.Supp. 727 (D.Colo.1972); Pease v. Havelock National Bank, 351 F.Supp. 118 (D.Neb.1972); Greene v. First National Exchange Bank, 348 F.Supp. 672 (W.D.Va.1972); Oller v. Bank of America, 342 F.Supp. 21 (N.D.Cal.1972); McCormick v. First National Bank, 322 F.Supp. 604 (S.D.Fla.1971); Brown v. United States National Bank, 509 P.2d 442 (Or.1973); Messenger v. Sandy Motors, 121 N.J.Super. 1, 295 A.2d 402 (1972); contra, James v. Pinnix (S.D.Miss.1973); Michel v. Rex Noreco, Inc., 12 U.C.C.Rptr. 543 (D.Vt.1972)
 
 
 [23]
 Although it may be argued that state action is a 'jurisdictional' question to be considered separate from substantive matters, the test of balancing facts and weighing circumstances seems to require consideration of the substantive facts. This should not result in a hierarchy of rights, or different state action tests for due process and equal protection, but rather should permit independent factual determinations of state action on a case-by-case approach
 
 
 [24]
 See Grafton v. Brooklyn Law School, 478 F.2d 1137 (2d Cir., 1973), where Chief Judge Friendly also suggested that (a) the fact that the challenged regulations required only what the law schools had been doing for years and, acting through their own professional organizations, had decided they should do, distinguished the challenged written examination requirements from state action found when disciplinary actions were taken under 'symbolic' regulations for maintenance of public order in Coleman v. Wagner College, 429 F.2d 1120 (2d Cir. 1970), and (b) while an
 'index of state involvement may be impermissible when it 'fosters or encourages' discrimination on the basis of race, the same limited involvement may not rise to the level of 'state action' when the action in question is alleged to confront other constitutional rights.' 478 F.2d at 1142.
 Thus, merely enacting into statutory form what had been the accepted practice for years, and a limited involvement that may be sufficient for racial cases, does not command a finding of 'state action' in an economic due process case.
 
 
 [25]
 See Fuentes v. Shevin, 407 U.S. 67, 103, 92 S.Ct. 1983, 32 L.Ed.2d 556 (White, J., dissenting); R. Johnson, Denial of Self-Help Repossession: An Economic Analysis, found in the Appendix to the Amicus Brief of the Permanent Editorial Board for the U.C.C., and filed separately with the Amici Briefs of Ford Motor Credit Co., General Motors Acceptance Corp., Chrysler Credit Corp., and C.I.T. Financial Services, Inc
 
 
 [26]
 Cf. Male v. Crossroads Associates, 469 F.2d 616 (2d Cir. 1972) (Urban Renewal Agency presented privately owned apartment complex with a fully prepared building site; held, symbiotic relationship)
 
 
 [27]
 Cf. Doe v. Bellin Memorial Hospital, 479 F.2d 756 (7th Cir. 1973) (no state action because government did not regulate the particular activity challenged, the State was not the beneficiary of the hospital's rules, and the hospital obtained no benefits from the State as a result of following the challenged procedures on abortion)
 
 
 [28]
 See Kirksey v. Theilig, 351 F.Supp. 727, 731 n.8 (D.Colo.1972); Neth, Repossession of Consumer Goods: Due Process for the Consumer: What's Due for the Creditor, 24 Case W.Res.L.Rev. 7, 56 (1972)
 
 
 [29]
 Summary repossession without notice or an opportunity for a hearing may in some instances be unconscionable, or void as a matter of public policy. See Ford Motor Credit Co. v. Waters, 273 So.2d 96 (Fla.Dist.Ct.App.1973); Fontaine v. Industrial National Bank, 298 A.2d 521 (R.I.1973). Both cases held wrongful, summary repossession where the creditor had previously accepted late payments after default. Cf. D. H. Overmyer Co. v. Frick Co., 405 U.S. 174, 187-88, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972)
 
 
 [30]
 Other cases that have stressed the continuous nature of the public enterprise or the continuity of regulation are: Male v. Crossroads Associates, 469 F.2d 616 (2d Cir. 1972); Smith v. Holiday Inns, Inc., 336 F.2d 630 (6th Cir. 1964); McClellan v. University Heights, Inc., 338 F.Supp. 374 (D.R.I.1972); McQueen v. Druker, 317 F.Supp. 1122 (D.Mass.1970), affirmed in part, 438 F.2d 781 (1st Cir. 1971); cf. Weigand v. Afton View Apartments, 473 F.2d 545 (8th Cir. 1973)
 
 
 [31]
 The 'public function' cases relied on by the debtors have held that activity undertaken by apparently private individuals or organizations may be characterized as the performance of a state or public function. Among others, they cite Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (state law extensively regulated Texas primaries, held that the Democratic Party was an agent of the State because the selection of party nominees was delegated to a private political party, thus exclusion of Negroes from voting in primaries was a Fourteenth Amendment violation); and Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (Texas county political group excluded Negroes from preprimary elections, which were not regulated by the State; however, because the winners of these elections nearly always ran unopposed in later elections, state action was found, either because the state permitted the only effective election or because the private group performed a state function). Among other distinguishing features, both of these cases may be limited to racial discrimination in voting, a practice specifically prohibited by the Fifteenth Amendment
 Another case cited by the debtors is Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). Public officials, pursuant to privately created trust, had managed a park; private trustees were appointed, but the Court held that the park remained a public facility, and that the private trustees were performing the same public function of park management-- the park was still entangled with the state. Under the terms of the will, however, the Georgia state court subsequently applied the cy pres doctrine and held that the property reverted to the testator's heirs because to permit Negroes to use the park would frustrate the intent of the testator. The Supreme Court found no discriminatory state action in giving effect to state law. Evans v. Abney, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970).
 In Abney, the courts were not called upon to enforce racial discrimination, but instead were called upon to recognize the privately created rights in the deed of trust, even though it contained a racial restriction apparently authorized by a state statute (which arguably had changed the common law). The Abney distinction between court enforcement of privately created rights and giving legal effect to those rights can be analogized to the facts here, where the creditor is not asking the court to enforce his right to possession, but rather is defending on the basis that the courts should recognize the legal effect of the provision for self-help repossession in the Code and in the security agreement. See Neth, supra, n. 28 at 60; Messenger v. Sandy Motors, 121 N.J.Super. 1, 295 A.2d 402 (1972).
 
 
 [32]
 Using a similar approach are Magro v. Lentini Brothers Moving & Storage Co., 338 F.Supp. 464 (E.D.N.Y.1971); and Klim v. Jones, 315 F.Supp. 109 (N.D.Cal.1970) (Judge Levin also speaks to the issue of jurisdiction under 1331.) See also B. Clark & J. Landers, Sniadach, Fuentes and Beyond: The Creditor Meets the Constitution, 59 Va.L.Rev. 355, 377 (1973)
 Subsequent history of Hall appears at 468 F.2d 845 (5th Cir. 1972).
 
 
 [33]
 In Adams this argument regarding the creditor's ownership of the property cannot be made. As stated, supra, Adams borrowed money and secured the loan by a note and security agreement giving the secured party the right to take possession. In Hampton the purchase was financed by a purchase contract payable in installments. Hall, on its facts, does not present such a distinction. The issue in Hall was the legality of a seizure resting solely upon a landlord's lien statute. While the statute in Hall provided that nothing therein 'shall prejudice' any contractual agreements between lessor and lessee concerning the subject matter of the statute (430 F.2d at 432 n. 1), there was no indication in the case that any such agreement had been made
 
 
 [34]
 2 F. Pollock & F. Maitland, The History of English Law 574 (2d ed. 1899)
 
 
 [35]
 See Pollock, note 34, supra
 
 
 [36]
 Accord, Pease v. Havelock National Bank, 351 F.Supp. 118, 122 (D.Neb.1972). It may also be argued that no debtor would reasonably think that in repossessing the unpaidfor vehicle, the creditor was acting as an arm of the state. Cf. Grafton v. Brooklyn Law School, 478 F.2d 1137, 1143 (2d Cir. 1973)
 
 
 [1]
 'We find in the reasoning of the court below a sufficiently close relation between the Federal Government and the radio service (on Capital Transit vehicles) to make it necessary for us to consider (whether the radio service violates the First and Fifth) Amendments. In finding this relation we do not rely on the mere fact that Capital Transit operates a public utility on the streets of the District of Columbia under authority of Congress. Nor do we rely upon the fact that, by reason of such federal authorization, Capital Transit now enjoys a substantial mononoply of street railway and bus transportation in the District of Columbia. We do, however, recognize that Capital Transit operates its service under the regulatory supervision of the Public Utilities Commission of the District of Columbia which is an agency authorized by Congress. We rely particularly upon the fact that that agency, pursuant to protests against the radio program, ordered an investigation of it and, after formal public hearings, ordered its investigation dismissed on the ground that the public safety, comfort and convenience were not impaired thereby.' Public Utilities Commission v. Pollak (1952) 343 U.S. 451, 462, 72 S.Ct. 813, 820, 96 L.Ed. 1068. Compare Reitman v. Mulkey, (1967) 387 U.S. 369, 379, 87 S.Ct. 1627, 18 L.Ed.2d 830, with McCabe v. Atchison, T. & S.F. Ry. (1914) 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169; Linscott v. Millers Falls Co. (1st Cir. 1971) 440 F.2d 14, 16, with Railway Employees' Dept. v. Hanson (1956) 351 U.S. 225, 231-232, 76 S.Ct. 714, 100 L.Ed. 1112
 The Supreme Court has consistently regarded the statement in Pollak as having the force of a holding. (See, e.g., Evans v. Newton (1966) 382 U.S. 296, 301, 86 S.Ct. 486, 15 L.Ed.2d 373; cf. Moose Lodge No. 107 v. Irvis (1972) 407 U.S. 163, 175-176 n. 3, 92 S.Ct. 1965, 32 L.Ed.2d 627.) Similarly, although Pollak addressed the issue of 'federal government action,' the Court has indicated that Pollak's principle is no less applicable in the state action context. (See Evans v. Newton, supra.) Finally, it is of note that Pollak was not a racial discrimination case. (See Evans v. Newton, supra, 382 U.S. at 319-320, 86 S.Ct. 486 (Harlan, J., dissenting).) Hence Judge Trask's suggestion, even if otherwise sound, that certain state action principles should be confined to racial discrimination controversies cannot be applied to the rule articulated in Pollak.
 
 
 [2]
 Cf. Evans v. Newton (1966), 382 U.S. 296, 301-302, 86 S.Ct. 486, 15 L.Ed.2d 373
 
 
 [3]
 Cf. Terry v. Adams (1953), 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152; Marsh v. Alabama (1946) 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265
 
 
 [4]
 Cf. Evans v. Newton (1966), 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373
 
 
 [5]
 One of the state's regulations indirectly exerted influence on the lodge's policies. The Court obliterated this indirect effect of the regulation when it held that the regulation, facially neutral, was unconstitutional insofar as it could be applied to enforce the lodge's racially discriminatory policies