Gilbert **PARKS** et al.

v.

**"MR. FORD"** d/b/a Ford's Speed
Shop et al.

William **MULDOWNEY, Jr.,** et al.

v.

**INTERNATIONAL CYCLES, INC.,** et al.

Civ. A. Nos. 72–639 and 73–1699.

United States District Court,
E. D. Pennsylvania.

Dec. 11, 1974.

As Amended Dec. 13, 1974.

Supplemental Opinion Jan. 10, 1975.

David A. Scholl, Chester, Pa., for plaintiffs.

Thomas E. Waters, Jr., Andrew E. Wakshul, Norristown, Pa., for defendant North Penn Motors.

## OPINION AND ORDER

FOGEL, District Judge.

Plaintiffs, in these consolidated actions, assert that the retention and sale elements of the "repairmen's lien" created by the common law and statutes of the Commonwealth of Pennsylvania[1]

---

1. The repairmen's lien, and the concomitant right to retain possession of the chattel until payment for the repairs has been made, *are creatures of the common law.* Wilson v. Malenock, 128 Pa.Super. 544, 194 A. 508 (1937), and cases cited therein. The right to sell the retained chattel, and the attendant provisions requiring notice and equitable disposition of the proceeds of sale, *were established by statute* (Act of May 7, 1925, P.L. 557, 6 P.S. §§ 11–14). Plaintiffs in these actions challenge *both the common law right of retention, and the statutory right of sale.*

violate the Fourteenth Amendment, to the extent that lienors are permitted to deprive persons of the use or ownership of their property without prior judicial determination of the validity of the underlying claim.

Before us are those aspects of plaintiffs' motions for "partial summary judgment" (pursuant to Rule 56(c) of the Federal Rules of Civil Procedure),[2] which raise the dual issues of the constitutionality of the challenged case and statutory law, and of the right to possession of property which may be subject to the repairmen's lien. Damage claims against the individual defendants have been held in abeyance, pending a ruling on these motions.

Discussion of the issues and the reasons in support of our conclusions in this matter follow:

### 1. *Procedural History of the Consolidated Actions and Summary of the Facts*

The procedural history of the litigation is complex because of the addition and elimination of various parties during these proceedings. Accordingly, we shall summarize only those claims of plaintiffs who are still parties to this action; the controlling facts are set forth in the affidavits submitted in support of the motions for partial summary judgment:

1. Plaintiff Gilbert Parks took his 1963 Chrysler automobile to Ford's Speed Shop, owned by defendant Henry Ford, a/k/a "Mr. Ford", on or about February 4, 1972. Parks claims that he authorized the replacement of a transmission seal, a job which he estimated would cost about Thirty Dollars ($30.00). After a delay of more than two weeks, he was notified that the work was completed, but that the bill (which included replacement of a convertor, a pump, and a rotor), would be Two Hundred and Three Dollars ($203.00). Parks protested these charges, and Ford retained possession of the automobile. After this action was brought in Federal Court, Ford started suit in the Municipal Court of Philadelphia, and recovered a judgment against Parks in the amount of One Hundred and Twenty-five Dollars ($125.00). Parks paid the amount of the judgment and regained possession of the automobile. Although Parks has no present claim with respect to the quality of the repairs, he still seeks damages for the alleged improper detention of his automobile.

2. Plaintiff Hattie Ellerbe had her 1960 Chevrolet towed to Bradley's Automobile Service, operated by defendant Alfred Bradley, Sr., on or about January 30, 1972. Ellerbe claims that she merely asked for an estimate for work to be performed, and did not authorize Bradley to repair the vehicle. Bradley later notified her that he had actually made the repairs, and that the charges totaled Four Hundred and Ninety-three Dollars and two cents ($493.02). Ellerbe refused to pay this amount; Bradley retained the automobile, and notified her, through counsel, that he was asserting a repairmen's lien under the applicable Pennsylvania statute. Thereafter, the automobile was placed on the street by Bradley, and when located by Ellerbe it had been stripped of its wheels and other parts. While the detention issue is moot, Ellerbe continues to press her damage claim.

3. Plaintiff Lewis Williams brought his 1966 Chevrolet Corvair to Erwin Chevrolet, Inc., late in the month of April of 1972. Williams claims that he arranged to purchase a starter motor elsewhere, and that Erwin agreed to install this motor for a labor charge of Twelve Dollars ($12.00). In fact, Erwin installed a rebuilt motor, and billed Williams for Forty-eight Dollars and fifty-five cents ($48.55). Williams refused to pay this charge; Erwin retained possession of the automobile, and notified him that unless the full amount was paid, the automobile would be placed with

---

2. We note that the term "partial summary judgment" is, strictly speaking, a misnomer; the technically correct term is "partial summary adjudication", or simply "interlocutory adjudication." See 6 Moore's Federal Practice ¶ 56.20 [1].

a storage and salvage company. Williams was joined as a plaintiff in this action on June 26, 1972, and shortly thereafter he regained possession of his vehicle by agreement of counsel. The automobile is no longer in Williams' possession, but he continues to press his damage claim for improper detention.

4. Anne Dillon, mother of plaintiff Lois Dillon, purchased a 1966 Chevrolet from defendant North Penn Motors, Inc., on or about June 25, 1971.[3] North Penn had granted to plaintiff a thirty-day warranty for mechanical defects, during which period, North Penn had agreed to pay fifty percent (50%) of the cost of necessary repairs. Shortly after the automobile was purchased, plaintiff had trouble with the transmission. After a delay, due to a labor dispute at North Penn Motors, plaintiff's automobile was repaired, at a cost to her of approximately One Hundred and Ninety-three Dollars ($193.00). However, she was billed for an additional amount of approximately One Hundred and Ninety-eight Dollars ($198.00) for replacement of wheels and tires which had been stolen from the automobile while in storage at the North Penn Motors used car lot, before execution of the work. Dillon refused to pay the entire amount claimed, and North Penn Motors retained the automobile. On June 26, 1972, Judge Masterson ordered the return of the automobile to Dillon, pending final disposition of the case, subject to entry of a bond in the amount of One Hundred Ninety-two Dollars and eighty cents ($192.80). Dillon furnished the bond, and still has possession of the automobile. Her continued right to possession, and her substantial claim for detention damages are still in dispute.

5. Plaintiff William Muldowney, Jr. brought his 1962 Triumph motorcycle to the shop of defendant, International Cycles, Inc., during the month of September, 1972. Muldowney authorized repairs of a gasket and an oil pump, conditioned upon an outside cost of Fifty Dollars ($50.00). After considerable delay, Muldowney was notified on or about April 1, 1973, that the motorcycle had been completely rebuilt and that the bill was in excess of Four Hundred Dollars ($400.00). Muldowney refused to pay this amount, and International retained possession of the motorcycle. After Muldowney began this action, International offered to return the motorcycle; plaintiff subsequently learned that International lost its lease, and that his motorcycle had been reduced to shattered pieces of metal that were strewn about the shop, now owned by one Edward Labelle. No responsive pleadings have ever been filed by International. Although plaintiff has not recovered possession of his motorcycle, he clearly would not accept the scrap that is the residue; his claim for damages, rather than for the right to continued possession, is not only proper, but the only sensible one that he could assert under the circumstances.

## 2. Summary of the Challenged Common Law and Statutory Provisions

The challenged repairmen's lien has evolved through case law and statutory enactments. In Pennsylvania, one who repairs a chattel, at the request of the owner, or of his or her authorized agent, has a common law lien which gives that person the right to retain possession of the chattel until payment is received. Wilson v. Malenock, *supra* at n. 1, 128 Pa.Super. at 547, 194 A. 508. The classic description of the common law lien is that given by Mr. Justice Woodward in a case which was decided by the Supreme Court of Pennsylvania in 1878:

It has long been a settled rule of the common law, that goods deposited with a tradesman or artizan for manufacture or repair, are subject for the

---

3. Plaintiff was a minor at the time of purchase, and for this reason title to the automobile was taken in the name of her mother. It is undisputed that the automobile was purchased for plaintiff's use, and North Penn Motors has never challenged plaintiff's right to bring this action in her own behalf.

work done on them to a specific lien. Thus, a tailor who has made a suit of garments out of the cloth delivered to him, is not bound to deliver the suit to his employer until he is paid for his services. Neither is a ship carpenter bound to restore the ship which he has repaired; nor a jeweler the gem which he has set, or the seal which he has engraved; nor an agistor the horse which he has taken on hire, until their respective compensations are paid. Story on Bailments, § 440, and the cases there cited. Though the right of lien probably originated in those cases in which there was an obligation, arising out of the public employment, to receive the goods, it is not now confined to that class of persons. A particular lien is given by the common law to any one who takes property in the way of his trade or occupation to bestow labor and expense upon it. And it exists equally whether there be an agreement to pay a stipulated price, or only an implied contract to pay a reasonable price: 2 Kent's Com. 635 * * * Mathias v. Sellers, 86 Pa. 486, 491, 27 Am.Rep. 723 (1878).

█ █ It is clear, however, that the common law lien confers upon the lienor *only the right of retention of the chat-*

*tel until the underlying debt is paid; at common law no right to sell exists. That remedy is a creature of statute.* R. Brown, The Law of Personal Property § 119 (2d. ed. 1955); Smyth v. Fidelity and Deposit Company of Maryland, 125 Pa.Super. 597, 602, 190 A. 398 (1937), aff'd per curiam 326 Pa. 391, 192 A. 640, 111 A.L.R. 481.[4] Indeed, the sale of the chattel by the lienor is a conversion, if such sale is executed without a statute authorizing foreclosure by this means, or if there is a failure on the part of the seller to comply meticulously with all of the procedural and substantive provisions of the governing statute. Brown, *supra,* at § 119; Bernstein v. Hineman, 86 Pa.Super. 198, 201 (1925); Boys Novelty Suit Co. v. Garfield, 76 Pa. Super. 365 (1921).

The Pennsylvania Legislature accorded lienors the additional remedy of enforcement of the common law lien by means of sale through its enactment of § 1 of the Act of May 7, 1925, P.L. 557, 6 P.S. § 11.[5] This provision requires thirty days' written notice to the owner of the chattel, coupled with a statement of the amount of indebtedness for which the lien is asserted, and permits the lienee an action in replevin within that period of time to regain possession of the property. Section 2 of the Act, 6 P.S.

---

4. At issue in the *Smyth* case was the general or "retaining" lien which arises in favor of an attorney who has possession of papers and documents belonging to his client. The opinion of the Superior Court, affirmed per curiam by the Supreme Court, makes it clear that the same principles apply to other common law liens which spring from possession. The lien is said to be passive, granting only a right to retain, and does not confer a right to enforce the lien by sale of the chattel subject to it. 125 Pa.Super. at 602, 190 A. 398. See In Re Professional Hockey Antitrust Lit., 371 F.Supp. 742, 747 (E.D.Pa.1974).

5. 6 P.S. § 11 provides as follows:
   § 11. Procedure for sale of personal property under common law lien
   Hereafter where any person, corporation, firm or copartnership may have what is known as a "common law lien" for work done or material furnished about the repair of any personal property belonging to an-

other person, corporation, firm, or copartnership, it shall be lawful for such person, corporation, firm, or copartnership having said common law lien, while such property is in the hands of the said person, corporation, firm, or copartnership contributing such work and material, to give notice in writing to the owner of the amount of indebtedness for which said common law lien is claimed for the labor and material that has entered into the repair, alteration, improvement, or otherwise, done upon the said property. If the said claim for said work or material is not paid within thirty days the said person, corporation, firm, or copartnership to which said money is due, may proceed to sell the said property, as hereinafter provided: Provided, however, That the owner of said property, if he disputes said bill, may issue a writ of replevin, as provided by law, within the said thirty days, and the said dispute shall be settled in said action of replevin. 1925, May 7, P.L. 557, § 1.

§ 12,[6] specifies the contents which the notice to the owner must contain, requires that it be verified by oath of the lienor, and mandates ten days' notice in advance of public sale. Section 3, 6 P.S. § 13,[7] deals with disposition of the proceeds after sale, and requires the lienor to account for the residue to the owner of the property, or, if no demand is made, to account to the treasurer of the county. Section 4, 6 P.S. § 14,[8] provides that the sale shall be conclusive with respect to the title of the property conveyed, in the same manner as if the sale had been conducted by the sheriff or constable.

It is this scheme of retention and sale, that does not require lienors to go to Court to adjudicate their rights, which plaintiffs claim is constitutionally defective. They argue that the entire rubric constitutes state action and, hence, denies property owners that due process of law to which they are entitled.

We deal first with the preliminary matters of jurisdiction and standing.

### 3. *Jurisdiction and Standing*

■ Jurisdiction is properly invoked under 28 U.S.C. § 1343(3), because plaintiffs contend that the alleged unlawful detention, which is the gist of their complaint, occurred under "color of . . . State law, statute, ordinance, regulation, custom or usage."[9] Gibbs v. Titelman, 502 F.2d 1107, 1109 (3d Cir. 1974).

In order to assess plaintiffs' standing to maintain this action, it is necessary to distinguish their *challenge with respect to the detention feature* of the common law lien from *their attack upon the sale provisions* of the statute. See Hernandez v. European Auto Collision, Inc., 487 F.2d 378, 382, 386–387 (2d Cir. 1973).

■ Each of the named plaintiffs claims to have suffered injury as a result of the purported unlawful *detention* of his or her vehicle pursuant to the common law lien. No vehicle, however, is presently detained.[10] Even in the ab-

---

6.  6 P.S. § 12 provides as follows:
    § 12. Notice of sale
    The notice hereinbefore provided for shall contain an itemized statement setting forth the work and material furnished for the repair, alteration, or improvement of the said personal property, and shall be verified by oath of the claimant; and if said claim is not paid within said thirty days then the said claimant may sell the said property at public sale by giving ten days' notice thereof in the same manner as personal property is sold by sheriff or constable. 1925, May 7, P.L. 557, § 2.

7.  6 P.S. § 13 provides as follows:
    § 13. Disposition of proceeds
    After satisfying the lien and any costs that may accrue, any residue remaining shall on demand, within six months, be paid to the owner of the property; and if such residue is not demanded within six months from the date of the sale, the same shall be deposited by the person making the sale with the treasurer of the county, together with a statement of the claim and the costs of enforcing the same, a copy of the published notice, and of the amounts received for the goods at said sale. Said residue shall by the county treasurer be credited to the general revenue fund of the county, subject to the right of the owner, or his personal representatives, to reclaim the same at any time within three years from the date of the deposit with

the county treasurer. 1925, May 7, P.L. 557, § 3.

8.  6 P.S. § 14 provides as follows:
    § 14. Title on sale
    All sales of property made under this act shall be as conclusive to the title conveyed as if sold by a sheriff or constable. 1925, May 7, P.L. 557, § 4.

9.  We distinguish the issue of *jurisdiction*, under 28 U.S.C. § 1343(3), from the *right to relief*, if any, under 42 U.S.C. § 1983. Gibbs v. Titelman, *supra*, 502 F.2d 1107, at n. 26; *see* Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

10. Ellerbe and Muldowney have never actually recovered possession of their vehicles. Ellerbe's 1960 Chevrolet was allegedly placed on the street by defendant Bradley, where it was stripped of wheels and other parts; when she located the vehicle she removed the license plate and abandoned it, since she concluded that it was worth less than $200.00, even before these parts were stolen, and was worthless thereafter. Muldowney's motorcycle was offered to him after the commencement of the present action, but parts of the engine were strewn about the shop, and some parts had in fact been used to repair motorcycles belonging to others. In each of these cases, the issue is damages and not detention, because neither plaintiff would accept the vehicle in the condition existing at the time it became available to him.

sence of detention, we are satisfied that the substantial damage claims, presently outstanding, create a justiciable controversy among these parties. The Supreme Court was confronted with a similar problem in the case of Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). Even though the late Representative Adam Clayton Powell had actually been seated in the 91st Congress, the Court held that his claim for back salary was still viable, and hence met the requisite test of justiciability. In so holding, the Court said:

> After certiorari was granted, respondents filed a memorandum suggesting that two events which occurred subsequent to our grant of certiorari require that the case be dismissed as moot. On January 3, 1969, the House of Representatives of the 90th Congress officially terminated, and petitioner Powell was seated as a member of the 91st Congress. 115 Cong.Rec. H22 (daily ed., January 3, 1969). Respondents insist that the gravamen of petitioners' complaint was the failure of the 90th Congress to seat Petitioner Powell and that, since the House of Representatives is not a continuing body and Powell has now been seated, his claims are moot. Petitioners counter that three issues remain unresolved and thus this litigation presents a "case or controversy" within the meaning of Art. III: (1) whether Powell was unconstitutionally deprived of his seniority by his exclusion from the 90th Congress; (2) whether the resolution of the 91st Congress imposing as "punishment" a $25,000 fine is a continuation of respondents' allegedly unconstitutional exclusion, see HR Res.No. 2, 91st Cong., 1st Sess., 115 Cong.Rec. H21 (daily ed., January 3, 1969); and (3) whether Powell is entitled to salary withheld after his exclusion from the 90th Congress. We conclude that Powell's claim for back

salary remains viable even though he has been seated in the 91st Congress and thus find it unnecessary to determine whether the other issues have become moot.

> Simply stated, a case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome. See E. Borchard, Declaratory Judgments 35–37 (2d ed. 1941). Where one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case or controversy. See United Public Workers of America v. Mitchell, 330 U.S. 75, 86–94, 67 S.Ct. 556, 562, 566, 91 L.Ed. 754 (1947); 6A J. Moore, Federal Practice ¶ 57.13 (2d ed. 1966).

> \* \* \* \* \* \*

Id., 395 U.S. at 495–497, 89 S.Ct. at 1950 (footnotes omitted)

Powell v. McCormack was followed in Collins v. Viceroy Hotel Corporation, 338 F.Supp. 390, 393 (N.D.Ill.1972), and Klim v. Jones, 315 F.Supp. 109, 117 (N.D.Cal.1970), in which those two district courts held that the return of property detained pursuant to an innkeepers' lien *did not* render plaintiffs' constitutional challenge moot, in light of the live claims for damages arising from the alleged unlawful detention.

Here, plaintiff Dillon alone seeks compensatory damages of Fifty-five Hundred Dollars ($5,500.00), a claim which is not frivolous in light of her allegation that she paid Nine Hundred and Two Dollars ($902.00) on account of her automobile loan and lost at least one job as a result of deprivation of her car during the eleven month period she was denied possession before Judge Masterson's Order of June 26, 1972.[11]

Accordingly, we hold that these plaintiffs have established a justiciable controversy under the rule of Powell v. Mc-

---

11. The case at bar is clearly distinguishable from Kerrigan v. Boucher, 450 F.2d 487 (2d Cir. 1971), in which the Court found that the concededly minimal damage claims were incidental to the constitutional challenge to the state statute.

Cormack with respect to the *detention* feature of the repairmen's lien.

A more subtle question is presented by plaintiffs' argument against the statutory *sale* provisions. No vehicle is presently detained under the common law lien; hence, it could be asserted that no lien is subject to enforcement by sale, because § 1 of the Act, 6 P.S. § 11, *is expressly limited to that period of time "while such property is in the hands of the said person, corporation, firm, or co-partnership contributing such work and material".*[11a] Close analysis of the operative facts, however, support plaintiffs' contention that a live controversy also exists with respect to this issue.

Plaintiff Dillon's vehicle, in fact, remained in the possession of North Penn Motors for eleven months, a time span during which the lien was clearly subject to enforcement by sale; it was returned to her only after Judge Masterson signed an Order compelling its surrender subject to the posting of a bond by Dillon in the amount of One Hundred Ninety-two Dollars and eighty cents ($192.80), "pending the final disposition of this matter." The issue, therefore, is whether the return of the vehicle, under those circumstances, renders Dillon's challenge to the sale provisions of the repairmen's lien moot.

█ The rule in Pennsylvania with respect to the common law lien, (as distinguished from the statutory right to sale), is that *voluntary* relinquishment of possession will destroy the lien, which thereafter cannot be revived by any subsequent reacquisition of possession. Bernstein v. Hineman, *supra*, 86 Pa. Super. at 201. *Nonconsensual* loss of possession, however, *does not* destroy the lien, Young v. Kimball, 23 Pa. 193 (1854), since such involuntary surrender of possession cannot properly be construed as a waiver of rights by the lienor. See *Brown, supra,* at § 121. Hence we conclude that the surrender of possession of Dillon's vehicle by North Penn Motors was not sufficiently consensual to destroy the common law lien.

Moreover, the right to enforcement of the common law lien by sale, which, in turn, depends upon possession of the chattel subject to the lien, should not be destroyed by giving up possession under the circumstances of the case at bar. It is clear that Judge Masterson's Order, which was specifically denominated a "preliminary injunction", affected the right to possession of the vehicle "pending the final disposition" of the litigation, and was not intended as a final determination with respect to any issue in the case. In Judge Frank's often quoted words:

> * * * a preliminary injunction * * * is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-beingness. It serves as an equitable policing measure to prevent the parties from harming one another during the litigation; to keep the parties, while the suit goes on, as far as possible in the respective positions they occupied when the suit began. Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742 (2d Cir. 1953).

In the instant case, Judge Masterson, in weighing the respective equities between the parties, ordered the return of Dillon's vehicle because of the peculiar hardship which she suffered as a result of its deprivation. The Order served as an equitable policing measure, *pendente lite*, protecting plaintiff from the coercive power of possession theretofore wielded by defendant, and at the same time protecting defendant by requiring the posting of a bond, should the Court ultimately decide that the injunction was improvidently granted. The final right to possession of the vehicle hinged, however, upon a definitive determination with respect to the constitutional validity of the challenged laws of the Commonwealth, an issue which

11a. Emphasis supplied.

was not decided, even on an interlocutory basis, when the preliminary injunction issued.

■ North Penn Motors' compliance with a preliminary injunction, lawfully issued by a Court of competent jurisdiction, cannot be construed as a waiver of its rights either under the common law or the statute. North Penn's uninterrupted detention of the vehicle for eleven months prior to the issuance of the injunction is vivid proof of that Company's intent to avail itself of all remedies it could invoke in order to compel payment of the sums allegedly due from Dillon. To hold that obedience to an Order of this Court amounts to a waiver of the valuable rights which flow from possession under the statute, would invite noncompliance with court orders on the part of lienors, a result which would be abhorrent and bizarre.

We emphasize that our discussion of the right to enforce the common law lien by means of sale is limited to the narrow issue of the existence of a justiciable controversy in Dillon's challenge to the statutory provisions which permit sale.[12] We do not decide the right to present possession of the vehicle, an issue which we expressly reserve for a meeting of counsel at a later date; see p. 32 *infra*. Nor do we adjudicate disposition of the bond furnished by Dillon in order to regain possession of her car, a matter which we will also decide at another time. For present purposes, it is sufficient to note that Dillon could at some future time be threatened by sale pursuant to the challenged statute.

Thus, we hold that all plaintiffs, with the possible exception of Muldowney,[13] have established the requisite existence of justiciable controversies which are sufficient to challenge the detention feature of the common law lien, and that Dillon, in addition, may also challenge the sale provision of the statute.

### 4. The Merits: State Action and Action "Under Color of State Law"

What are the merits of this matter? In our view, the threshold and dispositive question is whether the challenged conduct constitutes state action within the meaning of the Fourteenth Amendment, or conduct "under color of state law" within the meaning of 42 U.S.C. § 1983. *We hold that it does not.*

■■ It has been settled for nearly one hundred years that the proscription of the Fourteenth Amendment applies only to such action as may be attributed to the states, and does not inhibit, of its own force, the conduct of private individuals. The Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). The state action requirement of the Fourteenth Amendment is functionally equivalent to the requirement of § 1983 that the challenged conduct be "under color of state law". Gibbs v. Titelman, *supra*, 502 F.2d at 1110, citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

---

12. In this connection we note that the amount of the bond is $192.80, a sum which presumably covers the cost of repairs to the vehicle, but does not include the cost of wheels and tires that were installed. Thus it appears that even if the total amount of the bond were forfeited to North Penn Motors, there would remain a balance outstanding of about $198.00, for which North Penn Motors could seek to assert and enforce the repairmen's lien.

13. While plaintiff Muldowney's motorcycle is still in the shop in which it was "repaired", it appears from his affidavit, and from the representation of counsel, (Plaintiffs' Memorandum of Law in Support of their Renewed Motion for Partial Summary Judgment at P. 2), that defendant International Cycles, Inc., is no longer in business. No responsive pleadings in the case have ever been filed. Under these circumstances, we cannot say that Muldowney's motorcycle is subject to sale under the provisions of the Act. To the contrary, the motorcycle has apparently been abandoned by International Cycles on the premises of its former place of business. For discussion of the propriety of constitutional adjudication in a case in which defendant has failed to appear, see Kerrigan v. Boucher, *supra*, 450 F.2d at 489.

■ Plaintiffs argue vigorously that the entire fabric of decisional and statutory law woven by the Commonwealth constitutes State action. Yet it is undisputed that detention and sale of a chattel subject to the lien occur *without* the aid or participation of any official of the Commonwealth of Pennsylvania. *Hence, the issue before us is whether the existence of these common law and statutory remedies so infuses the otherwise private acts of detention and sale with state involvement that they, in turn, become state action.*

Plaintiffs have cited a number of state and lower federal court decisions in support of their proposition that enforcement of the lien in question involves state action. We have given close scrutiny to these decisions and find them unpersuasive with respect to the precise issue before us.

Several involve the active participation of state officials in enforcement of the lien, and are thus clearly distinguishable from this case in which no state officer participates directly or indirectly in the enforcement of the lien. Other cases deal with landlords' and innkeepers' liens, which, for the reasons discussed *infra,* present principles and issues that differ from those involved when adjudicating the validity of the repairmen's lien. Finally, those cases which are analogous to this action are no longer controlling as a result of the decision of the Court of Appeals for the Third Circuit in Gibbs v. Titelman, *supra,* and decisions in other circuits upon which the *Gibbs* Court relied.

We note, in passing, those cases in which state officials were *directly involved* in the enforcement of the challenged liens. In Santiago v. McElroy, 319 F.Supp. 284 (E.D.Pa.1970) (Three Judge Court), the defendants were constables who performed levies and sales pursuant to the distress for rent procedures under Pennsylvania law. Similarly, in Mason v. Garris, 360 F.Supp. 420 (N.D.Ga.1973) (Three Judge Court),

enforcement of the lien required application to the state courts in order to trigger proceedings which were akin to replevin. A lesser but perhaps still significant participation by state officials existed in Adams v. Department of Motor Vehicles, 113 Cal.Rptr. 145, 520 P.2d 961 (Supreme Court of California, filed· April 10, 1974), in which enforcement of the lien was supervised by a state agency that sent instructions and forms to the lienor and notice to the owner. None of these cases is controlling in this litigation, in which all parties agree *that no state officer is involved* in the assertion or enforcement of the lien.

It is true that generally courts deciding innkeepers' and landlords' lien cases have found the requisite state action. See e. g. Blye v. Globe-Wernicke Realty Co., 33 N.Y.2d 15, 300 N.E.2d 710 (1973) (innkeepers' lien); Hall v. Garson, 468 F.2d 845 (5th Cir. 1972) and 430 F.2d 430 (5th Cir. 1970) (landlords' lien); McQueen v. Lambert, 348 F.Supp. 1334 (M.D.Fla.1972) (landlords' lien); Collins v. Viceroy Hotel Corporation, 338 F. Supp. 390 (N.D.Ill.1972) (innkeepers' lien); Dielen v. Levine, 344 F.Supp. 823 (D.Neb.1972) (landlords' lien); Klim v. Jones, 315 F.Supp. 109 (N.D. Cal.1970) (innkeepers' lien).[13a]

To the extent, however, that any of these decisions may be interpreted as support for the contention that state action is present *whenever* a state law permits a *private individual* to perform acts which would be prohibited to the state *in propria persona* by the Fourteenth Amendment, we decline to extend their rationale to this case. We agree with Judge Blumenfeld in Kerrigan v. Boucher, 326 F.Supp. 647, 651 (D.Conn. 1971), aff'd on other grounds, 450 F.2d 487, who found insufficient state action in the Connecticut innkeepers' lien statute:

The state has not made these defendants agents of the State of Connecticut

13a. In Brinkley v. Merrill, No. C–258–73 (D.Utah, filed Oct. 3, 1973) (innkeepers' lien), the Court did not directly address the state action issue.

so as to require them while acting in their private capacity "to accord the procedural due process which the Fourteenth Amendment demands of a state." McGuane v. Chenango Court, Inc., 431 F.2d 1189, 1190 (2d Cir. 1970). *Contra* Hall v. Garson [citation]; Klim v. Jones [citation]. Cf. Santiago v. McElroy, *supra,* 319 F. Supp. at 292 (where the challenged statute authorized only state officials to conduct sales of distrained property). I do not find persuasive the reasoning in the latter two cited cases that the fact that the liens can be imposed and the sales performed only because of specific statutory authority is enough for state action under Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), and Reitman v. Mulkey, *supra,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 [(1967)]. A similar argument was made and decisively rejected in McGuane v. Chenango Court, Inc., *supra,* 431 F.2d at 1190 * * *

Even if the landlord and innkeeper lien decisions are correct within the limited context of their precise holdings, it is important to note that these cases have always presented unique factual situations which simply do not exist in cases that deal with other types of state statutes. It is illustrative on this score that the Court of Appeals for the 5th Circuit, which had previously decided (1970) and later reaffirmed (1973) the landmark case of Hall v. Garson, *supra,* (in which a landlords' lien statute was found to constitute state action), expressly *declined* to extend the doctrine of Hall v. Garson to private repossession pursuant to provisions of the Uniform Commercial Code:

* * * The *Hall* state function concept does not carry over to the present case with sufficient force to compel a finding of state action. In *Hall* the landlady seized goods to satisfy a debt arising out of an agreement having nothing to do with the goods. Such a taking closely resembles a seizure in satisfaction of a judgment— a function traditionally performed by a sheriff or other state agent. In the present case, by contrast, the appellant-creditor possessed and claimed no roving commission to extract appellee's goods to satisfy a separate debt. Rather, he had a specific purchase money security interest in a particular item, and he seized only that item. His action, moreover, was by long Mississippi tradition the sort of action performed by private persons, not state officials. [Citation omitted]. Finally, seizure by entry into a dwelling, in *Hall* a major decisional factor because it was deemed an indicium of state-like behavior, was absent from the instant case. James v. Pinnix, 495 F.2d 206, 208 (5th Cir. 1974)

It is our view that the conduct permitted under the challenged state law before us is much more akin to the conduct sanctioned by the UCC provisions at issue in James v. Pinnix, *supra,* than it is to the proscribed activity of landlords which was struck down in Hall v. Garson. The underlying debt arises only because the detained vehicle subject to the repairmen's lien has been enhanced in value as a result of the expenditure of labor and materials by the lienor. It is the chattel, so enhanced, already in the possession of the lienor, and it alone that can be retained. Thus, in sharp contrast to the innkeepers' and landlords' lien cases, there is absolutely no "roving commission" which allows the lienor to seize any other property within or beyond the possession of the chattel owner in satisfaction of the debt, nor is there a right granted to enter upon his or her premises, or into his or her dwelling, or upon the property of any third party for the purpose of seizing other goods of the owner to satisfy the debt and lien. For example, in this case, concededly the bond of Dillon may not be enough to satisfy her entire debt, if the claim is ultimately upheld in full; yet there is no contention that pursuant to this law,

North Penn Motors could summarily seize any other goods of Dillon, no matter where located, a situation that clearly distinguishes the operation of this lien from that of the landlords' and innkeepers' liens. We are satisfied, therefore, that decisions involving innkeepers' and landlords' liens are not controlling under the operative facts before us; we agree with the Court in James v. Pinnix, *supra,* which was unwilling to extend the rationale behind landlord and innkeeper decisions to factual situations that do not involve the unique objectionable features of those liens.

The repairmen's lien cases have either failed to discuss the state action issue, see e. g. Hernandez v. European Auto Collision, Inc., 487 F.2d 378 (2d Cir. 1973), Straley v. Gassaway Motor Company, 359 F.Supp. 902 (S.D.W.Va.1973), or have found that the state action requirement is satisfied, see e. g. Cockerel v. Caldwell, 378 F.Supp. 491 (W.D.Ky., filed April 22, 1974) (Three Judge Court), Lee v. Cooper, C.A. No. 74–104 (D.N.J., filed March 25, 1974), Ford v. Dean's O.K. Tire Store, Inc., Civ. No. LV 1974 (D.Nev., filed Feb. 9, 1974). The principles which underpinned those decisions unquestionably have been challenged by a series of recent decisions of various Courts of Appeals that have refused to find state action in private automobile repossession undertaken pursuant to provisions of the Uniform Commercial Code and similar state statutes.

In Gibbs v. Titelman, *supra,* the Court of Appeals for the Third Circuit concluded that plaintiffs *had not shown sufficient state action* in repossession cases pursuant to § 9–503 of the UCC and § 23A of the Pennsylvania Motor Vehicle Sales Finance Act. It is true that the facts of *Gibbs* do not track those before us. The Gibbs decision was expressly limited to a factual and legal situation in which the installment contracts at issue contain default and re-

possession provisions; the Court declined to decide the issue of state action when repossession is undertaken in the absence of such contractual provisions. Gibbs v. Titelman, *supra,* 502 F.2d at 1113, n. 15a.[13b] Nevertheless, we are persuaded that the controlling analysis of the Court which led it to reject a finding of state action under the circumstances of that case, dictates the same result in this case, even though we are not faced with contractual provisions which permit the challenged action.

Under § 9–503 of the UCC, the repossession remedy is available unless the contract expressly provides otherwise:

> Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action.

Moreover, the *Gibbs* decision places heavy reliance upon the Fifth Circuit case of James v. Pinnix, *supra,* which specifically declined to find state action even when the parties' contract is silent with respect to repossession upon default. 495 F.2d at 209.

Six United States Courts of Appeals, including the Third Circuit in *Gibbs,* have concluded that no state action exists in private repossessions pursuant to a state statutory scheme. In Shirley v. State National Bank of Connecticut, 493 F.2d 739 (2d Cir. 1974), cert. den. —— U.S. ——, 95 S.Ct. 329, 42 L.Ed.2d 284 (1974), the Court of Appeals for the Second Circuit found no state action in private repossession pursuant to § 42–98(a) of the Conn.Gen.Stat.Rev. which permits repossession without breach of the peace:

> "when the retail buyer is in default in the payment of any sum due under the retail instalment contract or instalment loan contract, or in the performance of any other condition which

---

13b. *See* Judge VanArtsdalen's opinion in Smith v. Bekins Moving & Storage Co., 384 F.Supp. 1261 (E.D.Pa., filed Nov. 25, 1974).

such contract requires him to perform, or in the performance of any promise, the breach of which is by such contract expressly made a ground for the retaking of the goods".

In James v. Pinnix, *supra,* the Court of Appeals for the Fifth Circuit found that no state action existed even when private repossession was not authorized by the instalment contract. In Turner v. Impala Motors, 503 F.2d 607, (6th Cir., filed Sept. 20, 1974), the Court of Appeals for the Sixth Circuit found no state action in repossessions under § 9–503, at least where such repossession was permitted under the conditional sales contracts. The Court of Appeals for the Eighth Circuit came to a similar conclusion in Nichols v. Tower Grove Bank, 497 F.2d 404 (8th Cir. 1974), as did the Ninth Circuit in Adams v. Southern California First National Bank, 492 F. 2d 324 (9th Cir. 1973), cert. den. —— U.S. ——, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974) (Douglas, J., dissenting from denial of cert.).

From the standpoint of State action, these decisions, which involve repossession under state statutory schemes, are generally indistinguishable from those dealing with repairmen's liens. Each situation encompasses action by private individuals undertaken pursuant to state decisional or statutory law, in which the state's involvement is merely permissive. Neither remedy permits a "roving commission" to seize property to satisfy an unrelated debt, but is specifically limited to seizure of a chattel which is either encumbered by a security interest, or the object of repairs or improvements which enhance its value. Neither remedy permits entry into a dwelling. Finally, even though each remedy may be set forth in a contractual provision, nevertheless, it may exist—at least in cases of repossession

under § 9–503—even when the underlying contract is silent as to that vital matter.

On this issue, therefore, we agree with Chief Judge Kaufman's dissent in Shirley v. State National Bank of Connecticut, *supra,* 493 F.2d at 745, in which he stated that distinctions between the repairmen's lien and repossession for purposes of state action, simply cannot withstand thoughtful analysis. Moreover, we believe this conclusion is buttressed by an examination of the ratio decidendi in *Gibbs* and the repossession cases upon which it relied.

Plaintiffs, however, have advanced two general theories of "public function" and "authorization and encouragement" in support of their contention that state action is present in the challenged repairmen's lien, even in the conceded absence of direct participation by state officials.

1. *Public Function:* Plaintiffs' first argument is that the very concept of private detention and sale of chattels subject to the common law lien, in and of itself, constitutes such a delegation of state function to private individuals as to completely permeate these nominally private acts with state action.

2. *Authorization and encouragement:* Their second contention is that the state, by sanctioning private detention and sale, is thereby engaged in an affirmative program of fostering, authorizing and encouraging the practice to such a degree as to equate the acts of individuals to acts of the Commonwealth itself.

Each of these two theses has been the subject of extensive judicial and academic discussion: unfortunately, the cacophony of the conflicting voices among courts and commentators has produced another Tower of Babel.[14] We

---

14. Among the multitude of academic commentaries, the following works present useful discussion of the issues : W. Burke and D. Reber, State Action, Congressional Power and Creditors' Rights : An Essay on the Fourteenth Amendment, 46 S.Cal.L.Rev. 1003–1114 (Parts I and II), 47 S.Cal.L.Rev. 1–57 (Part III) (hereinafter Burke and Reber) ; M. Yudof, Reflections on Private Repossession Public Policy and the Constitution, 122 U.Pa.L.Rev. 954 (1974) ; S. Mentschikoff, Peaceful Repossession Under the Uniform Commercial Code : A Constitutional and Economic Analysis, 14 Wm. & Mary L.Rev. 767 (1973).

have concluded, however, that close analysis of the facts of this case and of the operation of the lien provision at issue call for rejection of a finding of state action.

### (a) *Public Function*

As two perceptive commentators have noted,[15] the public function "rubic is hardly more descriptive than that of "state action". Each concept merely provides a very broad conceptional frame of reference within which to consider a given factual situation.

The classic definition of "public function" for purposes of the Fourteenth Amendment was given by the Supreme Court in Evans v. Newton, 382 U.S. 296, 299–300, 86 S.Ct. 486, 488, 15 L. Ed.2d 373 (1966):

> * * * What is "private" action and what is "state" action is not always easy to determine. See Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 [(1961)]. Conduct that is formally "private" may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action. The action of a city in serving as trustee of property under a private will serving the segregated cause is an obvious example. See Com. of Pennsylvania v. Board of Directors of City Trusts [353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957)]. A town may be privately owned and managed, but that does not necessarily allow the company to treat it as if it were wholly in the private sector. Thus we held in Marsh v. State of Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 [(1946)], that the exercise of constitutionally protected rights on the public streets of a company town could not be denied by the owner. A State is not justified, we said, in "permitting a corporation to govern a community of citizens so as

to restrict their fundamental liberties . . . ." Id., at 509 [66 S.Ct. at 280] [90 L.Ed. at 270]. We have also held that where a State delegates an aspect of the elective process to private groups, they become subject to the same restraints as the State. Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 [(1953)]. That is to say, when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations.

Yet generalizations do not decide concrete cases. "Only by shifting facts and weighing circumstances" (Burton v. Wilmington Parking Authority, supra, 365 U.S. at 722 [81 S.Ct. 856], 6 L.Ed.2d 45 [at 50]) can we determine whether the reach of the Fourteenth Amendment extends to a particular case. The range of governmental activities is broad and varied, and the fact that government has engaged in a particular activity does not necessarily mean that an individual entrepreneur or manager of the same kind of undertaking suffers the same constitutional inhibitions. While a State may not segregate public schools so as to exclude one or more religious groups, those sects may maintain their own parochial educational systems. Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468 [(1925)].

Plaintiffs argue that the Pennsylvania repairmen's lien is exactly the kind of delegation of a traditional public function to private individuals which subject any activity of the individual pursuant to such a grant to the same constitutional standards and tests that would be applied to the public body itself were it the actor. For example, they say that the Pennsylvania statute provides that "[a]ll sales of property made under this act shall be as

---

15. Burke and Reber, *supra*, 46 S.Cal.L.Rev. at 1050 *et seq.*

conclusive to the title conveyed as if sold by a sheriff or constable," 6 P.S. § 14, and contend that this provision, *eo ipso,* amounts to a delegation to private individuals of authority normally possessed only by state officials.

The Court of Appeals for the Third Circuit considered and rejected a similar contention in *Gibbs, supra,* 502 F.2d at 1113, in which plaintiffs had urged that the issuance of a certificate of title by state officials to purchasers at a sale following repossession rose to such a level of state action as to bring the repossession itself within the purview of the Fourteenth Amendment. In dismissing this argument, the Court said (footnote omitted):

> \* \* \* private repossessions are not infused with "state action" merely because a state issues a certificate of ownership to the secured party enabling it to transfer the automobile to a third party purchaser at a sale following repossession, Nichols v. Tower Grove Bank, 497 F.2d 404 (8th Cir. filed May 13, 1974); Shirley v. State National Bank [493 F.2d 739 (2d Cir. 1974)]; Adams v. Southern California First National Bank [492 F.2d 324 (9th Cir. 1973)].

Similarly, in the case at bar, the effect of 6 P.S. § 14 is merely to protect subsequent third-party purchasers of the liened chattel, through the provision granting the lienor the right to convey good title to the chattel sold, the same result that flows from the Pennsylvania statute which requires issuance of a certificate of title after a repossession sale, see 75 Pa.Stat. § 101 et seq. Hence this provision adds nothing to the right to sell, already conferred in earlier sections of the statute, and thus cannot be construed as a delegation of state authority to private individuals.[16]

We are unwilling to extend the rationale of Evans v. Newton and related decisions to the case and statutory law challenged in this litigation, particularly in light of the specific factual situations before us.[17] Analysis of the cases in which this rationale has been adopted discloses that almost invariably these cases have involved racial discrimination, an historical concern of the Fourteenth Amendment, and have also involved practices, prohibited to the States, that have persisted in nominally "private" entities which, for purposes of the Fourteenth Amendment, have not been found to be private at all.[18] See e. g. Evans v. Newton, Burton v. Wilmington Parking Authority, Terry v. Adams, *supra.* Other cases involving the doctrine have been concerned with First Amendment freedoms, rights that have always been accorded the broadest and most zealous protection against infringement by the state. See e. g. Marsh v. Alabama, *supra.*

The concern in these cases was either racial discrimination or abridgement of freedom of expression, traditional areas

---

16. Plaintiffs' reliance upon Hill v. Toll, 320 F.Supp. 185 (E.D.Pa.1970), is misplaced. *Hill* involved an allegation that bail bondsmen arrested, beat and robbed plaintiff while acting pursuant to a Pennsylvania statute which permitted such persons and their agents to "arrest and detain, and surrender their principals", 19 P.S. § 53. The Court concluded that by delegating to private individuals the right to employ physical coercion, upon which the state has a traditional monopoly and which is normally prohibited to the private citizen, the state had involved itself to a degree which made the subsequent abuse of power by the bail bondsmen subject to relief under § 1983. In the instant case, however, the statute does not purport to delegate to private individuals the general or specific authority possessed by sheriffs or constables, but merely assures a transfer of good title "as if" the sale had been conducted by one of these officers. The provision would clearly have had the same force and effect if it had merely stated that the lienor should have the power to convey good title to a subsequent purchaser, without mentioning any state official.

17. We note that the Court of Appeals in Gibbs v. Titelman concluded that there was "no similarity" between the Evans v. Newton line of cases and the automobile repossession statutes challenged in *Gibbs.* 502 F.2d at 1113.

18. See the analysis in Burke and Reber, *supra,* 46 S.Cal.L.Rev. at 1050 et seq.

of judicial surveillance that have created a distinct body of legal principles. We decline to undertaken such an unwarranted extension of the "public function" doctrine, one which threatens to erase the line between "state action" and purely private conduct.[19, 20]

#### (b) *Authorization and encouragement*

Plaintiffs' next contention is that the very existence of the lawful right of private detention and sale transforms individual action into state action because the Commonwealth is fostering, authorizing and encouraging the practice to such a degree that the acts of the individuals become state action within the meaning of the Fourteenth Amendment.

This argument is based upon an interpretation of Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), in which the Supreme Court found that a provision of the California Constitution which permitted private discrimination nevertheless so significantly involved that state in such discrimination as to constitute constitutionally proscribed state action. Plaintiffs argue that *Reitman* is controlling in the instant case, because in each of

the situations the state purports to affirmatively permit practices that it could not constitutionally undertake *in propria personna.*[21]

We reject this argument, and again decline to extend the doctrine of "authorization and encouragement", one which has evolved exclusively in those cases that have grappled with the issue of racial discrimination, to areas of procedural due process. We agree with Judge Friendly in Coleman v. Wagner College, 429 F.2d 1120, 1127 (2d Cir. 1970) (concurring opinion) that "racial discrimination is so peculiarly offensive and was so much the prime target of the Fourteenth Amendment that a lesser degree of involvement may constitute 'state action' with respect to it than would be required in other contexts . . . ." Similarly, the Court in Adams v. Southern California First National Bank *supra,* 492 F.2d at 333, was "not convinced that the resolution of the state action question involving prejudgment repossession of secured property is controlled by a case involving racial discrimination." Other courts have also been unwilling to extend *Reitman* into the area of procedural due

---

19. Plaintiffs also rely upon certain due process cases which are within the context of termination of service by a public utility, see e. g., Palmer v. Columbia Gas Company, 479 F.2d 153 (6th Cir. 1973), in support of their broad "public function" argument. While *Palmer* appears to have been rejected by the Third Circuit in Jackson v. Metropolitan Edison Company, 483 F.2d 754 (3d Cir. 1973), cert. granted 415 U.S. 912, 94 S.Ct. 1407, 39 L.Ed.2d 466, its rationale in any case is limited to a situation involving a public utility which was extensively regulated, and enjoyed a state-granted monopoly of an essential public service. Further, the Court in *Palmer* did not place great reliance upon other public utility precedents, holding that the significance of state involvement in private conduct could only be determined by an examination of the facts in each case.

20. Plaintiffs have also cited Stypman v. Melder, No. C–70–2315 AJZ (N.D.Cal., filed Feb. 8, 1974), a towing lien case in which the Court found that state action existed because the lien provisions were part of "a co-ordinated scheme which permit[ed]

state authorities to tow vehicles parked illegally and store them. The lien arrangements enable[d] the state to utilize private entities where otherwise agencies of the state would have to provide facilities." Under such circumstances, private towing companies were arguably performing a public function within the meaning of the public utility cases cited in note 19, *supra.* In any case, Stypman v. Melder is obviously inapplicable under the facts of the instant litigation, in which the repairmen serve no interest of the state in asserting and enforcing their liens.

21. We note that this argument was adopted by the Court in Cockerel v. Caldwell, *supra,* in which a divided panel held that "legislative embodiments of the public will, in the form of statutes, can be * * * considered actions of the state, even where they codify the common law, when the consequence of the statute enables private citizens to act in derogation of the Constitution." (378 F.Supp., p. 494). For the reasons discussed above, we find this reasoning unpersuasive, and agree with Judge Bratcher's dissenting opinion.

process; see e. g. James v. Pinnix, *supra;* Turner v. Impala Motors *supra;* Oller v. Bank of America, 342 F. Supp. 21, 23 (N.D.Cal.1972); Kirksey v. Theilig, 351 F.Supp. 727, 732–733 (D.Colo.1972); Pease v. Havelock National Bank, 351 F.Supp. 118, 121 (D. Neb.1972).

The Court in *Gibbs* distinguished Reitman v. Mulkey on the ground that self-help repossession had been permitted as common law, and thus the challenged statutes did not purport to permit conduct which had formerly been prohibited. We prefer to rely upon a somewhat different analysis, since the dichotomy between common and statutory law would produce an anomalous situation in the present case, in which one of the challenged practices (detention) was permitted at common law, while the other (sale) is a creature of statute. In this factual situation, which was not before the Court in *Gibbs,* we do not rely upon a distinction between decisional and statutory law, but base our analysis on the inapplicability of the rationale of *Reitman* to nonracial cases which raise questions of procedural due process under the Fourteenth Amendment. As the Court noted in James v. Pinnix, *supra,* 495 F.2d at 209 (footnotes omitted):

> A number of courts in § 9–503 cases have rejected debtors' *Reitman* contentions by holding that the UCC did not "create the right" to repossess via self-help, that the right flows exclusively from contract [law] and was recognized at state common law. We prefer not to follow that line of analysis-by-characterization. See Judge Byrne's dissent in *Adams,* 492 F.2d at 338. Were we to follow it, the answer it would yield when applied to Mississippi law would be uncertain. There is a reasonable, albeit conceptual, argument that the Mississippi legislature intended Article 9 of the UCC to supplant preexisting law and that therefore the power to repossess flows from § 9–503 today even though it was recognized in pre-UCC Mississippi common law. Even setting that argument to one side, that fact is that Mississippi cases did not sanction self-help repossession except when provided for in the parties' contract whereas § 9–503 allows it even when the contract is silent on the point. Thus the creditors' arguments that § 9–503 carried forward the former Mississippi practice and that the contract is the sole source of summary repossession power, lose some force.

No bright lines can be drawn in this area, and we draw none. Some state involvement in the *Reitman-Moose Lodge* sense may be present here, but it is simply not enough, given the nonracial nature of the case, to constitute state action. See Kirksey v. Theilig, *supra,* [351 F.Supp.] at 732–733.

Burke and Reber take a similar position, 47 S.Cal.L.Rev. at 47:

> The fact that the law under attack is new and creates, rather than codifies, common law rights should not change the inquiry. The focus for state action purposes should always be on the impact of the law on private ordering, not the law's age or historical underpinnings. Unless the law in some fashion significantly interferes with private ordering, the challenged conduct should not be attributed to the state. To make state action turn upon whether the statutory right being asserted has common law origins would lead to anomalous results. The identical private conduct pursuant to the identical state statutory law, would be state action in some states while not in others depending solely upon the fortuitous and unimportant circumstance of the age of the law.

See also Chief Judge Kaufman's dissent in Shirley v. State National Bank of Connecticut, *supra,* 493 F.2d at 745–746.

In essence, plaintiffs would have us hold that the mere existence of the challenged case and statutory law in

a controversy which does not involve racial dscrimination, constitutes such authorization, fosterage, and encouragement that subsequent conduct by individuals in conformity with the law amounts to state action. We cannot accept this contention, and find no support for it in Reitman v. Mulkey. Carried to its logical conclusion, such an argument would transform any conduct which is permitted by state law—or indeed, any conduct which is not expressly prohibited—into state action for Fourteenth Amendment purposes. Indeed, plaintiffs' position could produce the ironic result of limiting private action only to those individual acts which were contrary to state law. It could also result in compelling states to prohibit to its citizens the right to undertake any acts which the state itself could not constitutionally undertake, a result which would completely destroy the distinction between private conduct and state action.

As the Court noted in Oller v. Bank of America, *supra*, 342 F.Supp. at 23:

It is difficult to imagine any statutory provision that does not in some way, control human relationships. To say, as plaintiff seems to contend, that all human behavior which conforms to statutory requirements is "State action" or is "under color of State law" would far exceed not only what the framers of the Civil Rights Act ever intended but common sense as well.

Such terms as "authorization" "encouragement," and "fosterage" are misleading if they are used as unrefined tools to determine the outcome in a given situation. In effect, any conduct which is not expressly prohibited by law is to some extent authorized, encouraged, or fostered by the state. Yet, with the exception of the area of racial discrimination and abridgement of First Amendment rights, we believe it is significant that in a period of nearly one hundred years during which courts have been adjudicating the issue of state action, there has been a general reluctance to extend that concept to include private conduct in which the state's involvement is merely permissive. We decline to do so in this case.

We therefore conclude that plaintiffs have failed to show sufficient state involvement in the conduct of these defendants to constitute state action within the meaning of the Fourteenth Amendment, or acts under color of state law within the meaning of § 1983.

For this reason, plaintiffs' motions for partial summary judgment will be denied. We agree with plaintiffs that there is no dispute as to any material fact in the litigation, and therefore have determined that summary judgment should be entered in favor of defendants.[22] We will withhold entry of such judgment, however, pending a conference at which the parties will have an opportunity to present their views with respect to the equitable disposition of property subject to the repairmen's lien, and money paid into the Court as bond for the preliminary injunctive relief granted. Immediately following this conference, judgment will be entered for defendants and the preliminary injunction will be dissolved.

The following Order will be entered accordingly:

### ORDER

And now, to wit, this 11th day of December, 1974, it is ordered that plaintiffs' motions for partial summary judg-

---

22. It is clear that since the state action issue has been determined adversely to plaintiffs, they have failed to state a claim under 42 U.S.C. § 1983, and summary judgment should be entered for defendants, even in the absence of an appropriate motion. See e. g. Highway Truck Drivers & Helpers Local 107 v. Roadway Express, Inc., 266 F.Supp. 868, 869–871 (E.D.Pa.1966). In the instant case,

plaintiffs have had full opportunity to meet the contentions which defendants would have advanced had they seen fit to file summary judgment motions, and under these circumstances requiring cross-motions for summary judgment would be an unnecessary formality. 6 Moore's Federal Practice ¶ 56.12, and cases cited therein.

ment in the above captioned actions be and the same are hereby denied.

It is further ordered that a conference shall be held in this matter on January 7, 1975, at 10:30 A.M., in Room 2102 United States Courthouse, Philadelphia, Pennsylvania, after which a final order shall be entered consistent with this opinion as to the equitable disposition of the specific property subject to the repairmen's lien and of the money paid into Court as bond for the preliminary injunction granted in the case of Dillon.

## SUPPLEMENTAL OPINION AND ORDER

On December 11, 1974, we stated our intention to enter summary judgment in favor of defendants in these consolidated actions, as per the Opinion and Order of that date, on the dual grounds that plaintiffs had failed to show (1) sufficient state involvement in the conduct of defendants to constitute state action within the meaning of the Fourteenth Amendment, or (2) acts under color of state law within the meaning of 42 U.S.C. § 1983.[1]

In our Order, we specified that the entry of a final judgment would be withheld until a conference was held with counsel for the parties with respect to resolution of the outstanding injunction that had been entered by Judge Masterson on June 26, 1972,[2] ordering return of a vehicle of Lois Dillon by North Penn Motors, Inc. (North Penn). As a result of that conference, which took place on January 7, 1975, we have concluded that the injunction should remain in effect, pending appeal. We make the following Findings of Fact and Conclusions of Law, as required by Rule 52 of the Federal Rules of Civil Procedure, in support of the continuance of that injunction:[3]

## FINDINGS OF FACT

1. Anne Dillon, mother of plaintiff Lois Dillon, purchased a 1966 Chevrolet from defendant North Penn on or about June 25, 1971.

2. Shortly after the automobile was purchased, plaintiff had problems with the transmission, and asked North Penn to make repairs, pursuant to its warranty.

3. A dispute arose between plaintiff and North Penn with respect to payment for wheels and tires replaced by North Penn. Plaintiff claims the replacement was caused by North Penn's dereliction in permitting the vehicle to be left on an unguarded lot where these parts were stripped. North Penn maintains that the repair order permits a disclaimer by it for losses due to theft.

4. Plaintiff refused to pay the entire amount claimed by North Penn, and the automobile was not returned to her.

5. On June 26, 1972, Judge Masterson ordered the return of the automobile by North Penn subject to the payment into Court of a bond in the amount of One Hundred Ninety-two Dollars and eighty cents ($192.80).

6. Plaintiff paid this amount into Court and recovered possession of her automobile.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of plaintiff Dillon and defendant North Penn.

2. This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. § 1343(3). Gibbs v. Titelman, 502 F.2d 1107, 1109 (3d Cir. 1974).

3. In a case in which an appeal is taken from a judgment denying

---

1. The United States Court of Appeals for the Seventh Circuit reached a similar conclusion in Phillips v. Money, 503 F.2d 990 (7th Cir., filed September 13, 1974). *See also* Jackson v. Metropolitan Edison Co., 415 U.S. 912, 94 S.Ct. 1407, 39 L.Ed.2d 466 (1974).

2. See the Opinion and Order of December 11, 1974, at pp. 3-4.

3. The record does not disclose the entry of Findings of Fact and Conclusions of Law by Judge Masterson at the time of the entry of the injunction. Although no objection has been raised by any of the parties, we believe that at this time such Findings and Conclusions should be made because we intend to continue the injunction, pending appeal.

**1270**

an injunction, the Court in its discretion may grant or continue an injunction pending appeal upon such terms as the Court may find proper. Rule 62(c), Federal Rules of Civil Procedure; Mayflower Industries v. Thor Corporation, 182 F.2d 800, 801 (3d Cir. 1950).

■ 4. (a) The legal questions in this case are substantial and complex and the precise issue has not been decided by the Court of Appeals for the Third Circuit.[4]

(b) Substantial injury may be caused to plaintiff Dillon if the Injunction is not continued.

(c) The rights of defendant North Penn are fully protected by the bond paid into Court by plaintiff Dillon, which will remain in the custody of the Clerk.

(d) The rights of the public will not be adversely affected if the injunction is continued.

5. Defendant North Penn may apply to this Court for dissolution of this injunction if a timely Notice of Appeal is not filed by plaintiff Dillon pursuant to Rule 3 of the Federal Rules of Appellate Procedure.

An appropriate Judgment will be entered of even date with this Supplemental Opinion and Order.

## JUDGMENT

And now, to wit, this 10th day of January, 1975, it is odered that Summary Judgment be and the same is hereby entered in favor of defendants and against plaintiffs in the above captioned consolidated actions.

It is further ordered, pursuant to Rule 62(c) of the Federal Rules of Civil Procedure, and for the reasons stated in the Memorandum filed of even date with this Judgment, that pending appeal, the Preliminary Injunction entered in this matter on June 26, 1972, shall continue in full force and effect and the money paid into Court as bond therefor shall be retained by the Clerk.

Defendant North Penn Motors, Inc. may apply to this Court for dissolution of this Injunction, if a timely Notice of Appeal is not filed pursuant to Rule 3 of the Federal Rules of Appellate Procedure.

With the sole exception of the continuance of the injunction pending appeal, all relief sought by plaintiff in these consolidated actions shall be, and the same is hereby denied.

4. See Opinion and Order of December 11, 1974, at P. 19 et seq.; *see also* Phillips v. Money, *supra* at N. 1.